STATE OF NEBRASKA, APPELLEE, V.
NECDET CANBAZ, APPELLANT.
611 N.W.2d 395

Filed May 26, 2000.   No. S-99-848.

Michael D. Nelson, of NelsonMcClellan, for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

Hendry, C.J., Wright, Connolly, Gerrard, Stephan, McCormack, and Miller-Lerman, JJ.

Hendry, C.J.

## INTRODUCTION

Necdet Canbaz was found guilty after a jury trial of first degree murder and use of a weapon to commit a felony in the shooting death of Debora Peralta. Canbaz now appeals.

## STATEMENT OF FACTS

Peralta and Canbaz began a relationship in approximately 1992 and lived together in Canbaz' home for approximately 4 years prior to Peralta's death. In early July 1998, Peralta ended the relationship with Canbaz and moved out. Canbaz was very upset and angry with Peralta for ending the relationship. He made statements to neighbors and coworkers that he was angry with Peralta and wanted to hurt her and kill her and her family members.

On September 5, 1998, Canbaz took Peralta out for dinner. They then spent the night at Canbaz' home. Canbaz left the following morning, and when he returned home around midday, Peralta was gone.

Peralta had returned to her apartment. At about 12:20 p.m., Peralta called the Sarpy County Family Service Domestic Abuse Program from her apartment. She spoke with Theresa Hamilton, who worked for Family Service, asking questions and seeking general information. After about 2 minutes of conversation, Peralta became very frantic and the pitch of her voice rose. She said, "[H]elp, help. He's coming in. He's coming in. Call the police." Hamilton then heard Peralta screaming, after which a man came on the line and said hello three times. Hamilton did not answer, and after about 30 seconds, she disconnected and called the 911 emergency dispatch service, giving them Peralta's telephone number.

Peralta ran outside. Canbaz ran after her and shot her in the back of the head. Peralta collapsed on the sidewalk. Canbaz came up to her and shot her again in the neck. Canbaz then left the scene in his Jeep and later went to his ex-wife's home. He left his ex-wife a note saying that he had killed Peralta. The police, acting on information received from several witnesses to the shooting, arrested Canbaz later that day. After being properly informed of his *Miranda* rights, Canbaz gave a statement to the police.

In Canbaz' statement to the police, he admitted that he was very upset when Peralta moved out. He admitted that Peralta took out a protection order against him after the move because she was scared. He admitted that he had a sale in late August to dispose of his belongings. He admitted that he went to Peralta's apartment the day of the shooting, purportedly to recover $30,000 which she had taken from him when she left his home earlier that day. Canbaz stated Peralta was on the telephone when he pushed away some bookcases blocking the door and entered the apartment and that he picked up the receiver and said hello. Further, he admitted that as they were leaving the apartment, Peralta ran away from him and that he shot her. He also stated he had an airline ticket to leave for Turkey to see his father, with a departure date a few days after the shooting.

However, he denied ever saying that he would kill Peralta or her family.

Canbaz was charged with first degree murder and use of a weapon to commit a felony. Canbaz pled not guilty. At trial, after the State had presented about two-thirds of its evidence, the court met with counsel in chambers to discuss the State's motion in limine concerning testimony to be presented by Dr. Robert Gutnick, Canbaz' medical expert. The State also informed Canbaz' attorney at this meeting that it intended to have a rebuttal expert listen to Gutnick's testimony. At the end of the conference, Canbaz' attorney made a request to sequester witnesses, which the court granted. The defendant did not request that the court sequester the State's rebuttal witness.

Canbaz did not raise an insanity defense, but instead introduced expert medical testimony from Gutnick in an effort to negate the State's evidence of premeditation. Gutnick opined that at the time of the shooting, Canbaz was suffering from a major depressive disorder with psychosis, panic disorder, and disassociative amnesia. However, Gutnick also testified that Canbaz could, at the time this incident occurred, form an intent of action. Gutnick's opinions were based on medical records from Canbaz' general physician, Dr. David Jasper; medical records from Canbaz' counselor, Roger Yarns, M.S.W.; the police reports on the shooting, including Canbaz' statement; and a 2½-hour medical examination performed by Gutnick.

After Gutnick testified, the State called Dr. Y. Scott Moore as a rebuttal witness concerning Gutnick's testimony. Moore's opinions were based on the same records that Gutnick used, plus Gutnick's written report from his examination of Canbaz and Gutnick's testimony at trial. Moore opined that Canbaz was not suffering from a major depressive disorder at the time of the shooting because Canbaz did not display significant characteristics common to a major depressive disorder. Moore also opined that Canbaz was not suffering from disassociative amnesia because Canbaz was able to give a clear account of the events during, prior to, and after the shooting.

Canbaz objected to Moore's testimony on the basis of foundation, violation of the pretrial discovery order, and violation of the witness sequestration order. He also objected to the testi-

mony of other witnesses, namely Hamilton, the Family Service worker who took Peralta's call; Gene Simon and Sandy Simon, Canbaz' neighbors; Erin Whittington, an acquaintance of Canbaz; and Catherine Clemons and Diane Handley, Canbaz' coworkers. These objections were overruled.

Canbaz was found guilty and sentenced to life imprisonment for the murder of Peralta and 5 to 10 years' imprisonment for the use of a weapon to commit a felony.

## ASSIGNMENTS OF ERROR

Canbaz asserts, rephrased and summarized, that the trial court erred in (1) allowing into evidence the testimony of Moore, Hamilton, Whittington, Gene Simon, Sandy Simon, Handley, and Clemons and (2) overruling Canbaz' motion for a new trial.

## STANDARD OF REVIEW

■ The admissibility of evidence is reviewed for an abuse of discretion, where the Nebraska rules of evidence commit the evidentiary question at issue to the discretion of the trial court. *State v. Sanchez*, 257 Neb. 291, 597 N.W.2d 361 (1999); *State v. Chojolan*, 253 Neb. 591, 571 N.W.2d 621 (1997).

■ When judicial discretion is not a factor involved in assessing admissibility, the court's application of the Nebraska rules of evidence will be upheld unless clearly erroneous. *State v. Jacob*, 242 Neb. 176, 494 N.W.2d 109 (1993).

■ The decision whether to exclude expert witness testimony in a criminal case is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. Larsen*, 255 Neb. 532, 586 N.W.2d 641 (1998).

■ In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Clark*, 255 Neb. 1006, 588 N.W.2d 184 (1999); *State v. Larsen, supra*.

## ANALYSIS

### Testimony of Moore

■ Canbaz first asserts that the trial court erred in admitting the expert testimony of Moore. The decision whether to exclude

expert witness testimony in a criminal case is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. Larsen, supra.* An abuse of discretion takes place when the sentencing court's reasons or rulings are clearly untenable and unfairly deprive a litigant of a substantial right and a just result. *State v. Bartholomew,* 258 Neb. 174, 602 N.W.2d 510 (1999).

■ At trial, Canbaz' attorney objected to Moore's testimony on the basis of foundation, stating, "My foundational objection is that this person has never met Mr. Canbaz and, therefore, does not have foundation to give testimony or any opinions in this case." Opinion evidence which is unsupported by appropriate foundation is not admissible. *State v. Clark, supra.* Thus, according to Canbaz, the trial court abused its discretion in allowing Moore to testify.

In his brief, Canbaz relies on *Tvrz v. State,* 154 Neb. 641, 48 N.W.2d 761 (1951), to assert that a personal examination of a defendant by the testifying expert is required in order for a medical expert to have the proper foundation to render an opinion regarding the defendant's state of mind. In *Tvrz,* we stated three possible ways to lay a proper foundation: acquaintance with the party under investigation, a medical examination made by the expert, or a hypothetical case stated to the expert in court. Thus, *Tvrz* does not support Canbaz' assertion that a personal medical examination is necessary. Furthermore, in 1975, the Legislature adopted Neb. Rev. Stat. § 27-703 (Reissue 1995), regarding expert testimony. The statute states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

■ The trial court did not abuse its discretion in determining that Moore possessed sufficient foundation to offer his opinion regarding Canbaz' mental state under § 27-703. An expert must possess facts which enable him or her to express a reasonably accurate conclusion as distinguished from a mere guess or con-

jecture. *State v. Johnson*, 215 Neb. 391, 338 N.W.2d 769 (1983). Here, the record shows that Moore's opinions were based on a review of the same information upon which Gutnick relied, namely Canbaz' medical records and the police reports from the shooting, which included Canbaz' statement. Moore additionally reviewed Gutnick's written report and Gutnick's testimony regarding his examination of Canbaz, which incorporated some of Canbaz' statements to Gutnick during the examination. As such, Moore had sufficient facts to allow him to express his opinion regarding Canbaz' mental state. The trial court did not abuse its discretion in concluding that Moore had sufficient foundation to testify. See, e.g., *McGilberry v. State*, 741 So. 2d 894 (Miss. 1999) (state's expert witness not required to personally examine defendant).

▪ Canbaz also asserted at trial that Moore should not be allowed to testify because the State did not disclose Moore's identity as a witness prior to trial. Such nondisclosure, argues Canbaz, amounts to a violation of the district court's pretrial discovery order. Canbaz does not argue in his brief that Moore's testimony was somehow improper rebuttal testimony. In fact, the record shows that Moore's testimony was offered by the State, after Gutnick offered his testimony on behalf of Canbaz, to rebut Gutnick's evidence regarding Canbaz' mental state at the time of the shooting. See *State v. Fahlk*, 246 Neb. 834, 524 N.W.2d 39 (1994). As a proper rebuttal witness, "[i]t has long been the rule in this state that the requirement that the names of the witnesses for the state must be endorsed upon the information has no application to rebuttal witnesses." *State v. Pratt*, 197 Neb. 382, 387, 249 N.W.2d 495, 498 (1977). See, also, *Griffith v. State*, 157 Neb. 448, 59 N.W.2d 701 (1953). Thus, the State was not required to provide Canbaz with Moore's name prior to trial.

Canbaz asserts, however, that the pretrial discovery order obligated the State to name rebuttal witnesses. The pretrial discovery order, drafted by Canbaz, ordered the State to provide various items, including "the names, addresses and telephone numbers of all witnesses upon whose evidence the charges are based." The discovery order does not require the State to disclose any information with regard to rebuttal witnesses. Thus,

we find no abuse of discretion in allowing Moore to testify because the trial court correctly determined that the State had no obligation under our case law, or under the terms of the discovery order, to identify Moore as a rebuttal witness prior to his testifying.

Finally, Canbaz asserts that Moore should not have been allowed to testify because Moore was present in the courtroom during the testimony of Gutnick, in violation of the witness sequestration order entered by the court. The reasoning from *State v. Vosler*, 216 Neb. 461, 345 N.W.2d 806 (1984), and *State v. Jackson*, 231 Neb. 207, 435 N.W.2d 893 (1989), is helpful in addressing this issue.

In *Jackson*, the defendant requested that the State's expert medical witness be sequestered during trial. The trial court denied the request. The State explained that the presence of its expert was necessary because the State " 'has no opportunity under the law, unless the defense allows [it], to examine the defendant at all, other than to be present in court when [the defendant] testifies.' " 231 Neb. at 213, 435 N.W.2d at 897. We recognized in *Jackson* that there are constitutional constraints upon the State's ability to obtain information on a defendant's mental state and concluded that the trial court did not abuse its discretion in refusing to sequester the State's expert.

In *Vosler*, we noted that because the State could not compel a defendant to submit to a mental examination unless he or she tenders an insanity defense, "[t]he State could also have an appropriate witness attend the trial and testify on the issue [of the defendant's mental state] based upon what the witness learned as a result of the evidence adduced at trial." 216 Neb. at 471, 345 N.W.2d at 812.

Consistent with *Jackson* and *Vosler*, we find that the trial court did not abuse its discretion in allowing Moore to testify because Moore was properly present in the courtroom during Gutnick's testimony.

### TESTIMONY OF HAMILTON

Canbaz next asserts that the trial court erred in admitting the testimony of Hamilton, the Family Service worker who received Peralta's call. At trial, Canbaz' attorney objected to Hamilton's

testifying that during the call, Peralta said, "[H]elp, help. He's coming in. He's coming in. Call the police." Canbaz asserted that this testimony was hearsay and lacked foundation because Hamilton did not personally know the identity of the woman she spoke to on the telephone.

The State argues that Hamilton's testimony as to what Peralta said on the telephone was admissible under the excited utterance hearsay exception. For a statement to qualify as an excited utterance, the following criteria must be met: (1) There must have been a startling event, (2) the statement must relate to the event, and (3) the statement must have been made by the declarant while under the stress of the event. *State v. Anderson*, 245 Neb. 237, 512 N.W.2d 367 (1994). See, also, Neb. Rev. Stat. § 27-803(1) (Reissue 1995). Hamilton testified that after 2 minutes of calm conversation, "[t]he pitch of [Peralta's] voice rose. She became excited, agitated. . . . She said help, help. He's coming in. He's coming in. Call the police. . . . She was like yelling, screaming at that point."

Peralta's statement meets the criteria for the excited utterance exception. There was a startling event, in the form of Canbaz' forcing his way into Peralta's home. Peralta's statement related to this event. Peralta was under the stress of the event when she made her statement, as evidenced by the fact that she was yelling and frantic. The court did not err in determining that Hamilton's testimony as to Peralta's statement was admissible under the excited utterance exception.

Canbaz also argues that Hamilton lacked the foundation to testify because she did not know the actual identity of the woman who called her. Hamilton testified that at the beginning of the call, the caller gave Hamilton the telephone number from where she was calling. Officer Marlin McClarty, who responded to the 911 emergency call made by Hamilton, testified that the telephone number given to the 911 dispatch operator matched Peralta's address, 414 North 39th Street. Further, Canbaz admitted in his statement that Peralta was on the telephone when he entered her apartment. He picked up the telephone and said hello, but there was no answer. This corresponds with Hamilton's testimony that after Peralta said, "[H]elp, help. He's coming in. He's coming in. Call the police,"

a man came on the line and said hello, to which Hamilton did not respond. This evidence sufficiently established that Peralta was the person Hamilton spoke to on the telephone. The trial court did not err in determining that Hamilton had sufficient foundation to testify regarding the telephone conversation. Canbaz' assignment of error regarding Hamilton's testimony is without merit. See *Parker v. State*, 129 Md. App. 360, 742 A.2d 28 (1999).

### TESTIMONY OF WHITTINGTON

Whittington, an acquaintance of Canbaz, testified that a few days before the shooting, Canbaz told her "he was moving back to Turkey but I'd see him on the news before he left." Canbaz asserts that Whittington's testimony lacked relevance and, further, assuming it was relevant, that her testimony was more prejudicial than probative under Neb. Rev. Stat. § 27-403 (Reissue 1995).

Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *State v. Myers*, 258 Neb. 272, 603 N.W.2d 390 (1999); *State v. Sanchez*, 257 Neb. 291, 597 N.W.2d 361 (1999). Whittington's testimony about Canbaz' statement shortly before the murder was relevant in that it was evidence of Canbaz' intentions. Canbaz' assertion that Whittington's testimony is irrelevant is without merit. Canbaz further asserts, however, that the trial court abused its discretion in admitting Whittington's testimony because, if relevant, it was more prejudicial than probative.

Under § 27-403, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." "For the purposes of this rule . . . [u]nfair prejudice means an undue tendency to suggest a decision based on an improper basis." (Citations omitted.) *State v. Newman*, 250 Neb. 226, 241-42, 548 N.W.2d 739, 751 (1996). After carefully reviewing the record, we find that the trial court did not abuse its discretion in determining that Whittington's testimony was more probative than prejudicial. This assignment of error is without merit.

### Testimony of Gene Simon, Sandy Simon, Handley, and Clemons

Finally, Canbaz argues that the trial court abused its discretion in admitting the testimony of Canbaz' neighbors and coworkers regarding statements Canbaz made to them about wanting to kill Peralta and/or her family.

Gene Simon testified that after Peralta moved out in early July 1998, "[Canbaz] mentioned on several occasions that he would like to kill her or that he wanted to kill her. . . . [H]e mentioned he had bought five pairs of handcuffs and he was going to kill each and every member of her family." Sandy Simon, Gene Simon's wife, testified that after Peralta moved out, "[Canbaz] confronted me outside in my driveway very angry, upset; and repeatedly [sic], I'm going to kill Debbie and her family." Handley, a coworker of Canbaz, testified that the day after Peralta moved out, Canbaz told her that "he had been driving around all night looking for [Peralta] trying to find her. . . . He said that he was going to hurt her and that she wasn't going to get away with it and that he would make her pay. . . . He said that he had a gun." Clemons, another coworker, testified that she had one conversation with Canbaz sometime after Peralta moved out, where "[Canbaz] talked about wanting to hurt [Peralta]. He said that at one point, he would kill her and then kill himself." When Canbaz picked up his paycheck on August 31, he told Clemons "by the end of his vacation, it would be all over."

Canbaz argues that these statements are irrelevant and prejudicial evidence of prior bad acts under Neb. Rev. Stat. § 27-404(2) (Reissue 1995). Prior bad act evidence is evidence of other crimes, wrongs, or acts, aside from the crime charged, which tend to prove the character of a person and to show that he or she acted in conformity therewith when committing the charged crime. *Id.* See, also, *State v. McManus*, 257 Neb. 1, 594 N.W.2d 623 (1999). Prior to trial, the State argued that § 27-404 was inapplicable to the disputed statements because the statements were relevant only to this crime, and not evidence of any other prior crimes. See *State v. McManus, supra.* However, the court determined that § 27-403 applied, and held a pretrial hearing regarding the disputed testimony. The court determined that

the disputed evidence was admissible, subject to a limiting instruction that such evidence should be considered by the jury only to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident in the crimes charged against defendant." See § 27-404(2).

The testimony of Canbaz' neighbors and coworkers is not evidence of prior unrelated bad acts under § 27-404(2). It is relevant evidence that Canbaz murdered Peralta intentionally and with premeditation. The disputed evidence was offered by the State to specifically show that Canbaz formed an intentional, premeditated plan to kill Peralta. The trial court erred in concluding that § 27-404(2) applied to the disputed testimony. However, this error resulted in no prejudice to Canbaz. The limiting instruction at trial simply admonished the jury to consider the disputed testimony for the very purpose for which it was admitted.

Canbaz further argues that the trial court erred in admitting the disputed statements under § 27-403 because the statements were more prejudicial than probative. As we have already noted, under § 27-403, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." "Unfair prejudice means an undue tendency to suggest a decision based on an improper basis." *State v. Newman,* 250 Neb. 226, 242, 548 N.W.2d 739, 751 (1996).

The testimony of Canbaz' neighbors and coworkers was not unfairly prejudicial, confusing, or misleading to the jury. This testimony provided a proper basis for determining whether Canbaz killed Peralta intentionally and with premeditation. The trial court did not abuse its discretion in admitting the testimony of Gene Simon, Sandy Simon, Handley, and Clemons. Canbaz' assertion to the contrary is without merit.

## MOTION FOR NEW TRIAL

Canbaz also asserts that the trial court erred in not granting his motion for a new trial. Because Canbaz has failed to show any error committed by the trial court, we conclude that the trial court did not abuse its discretion in denying the motion for a new trial.

## CONCLUSION

Having considered all of Canbaz' assigned errors, we conclude they are without merit and affirm his convictions and sentences.

AFFIRMED.