STATE OF NEBRASKA, APPELLEE, V.
CLIFFORD J. DAVLIN, APPELLANT.
639 N.W.2d 631

Filed March 1, 2002. No. S-00-958.

Jerry L. Soucie and Robert W. Kortus, of the Nebraska Commission on Public Advocacy, for appellant.

Don Stenberg, Attorney General, and Martin W. Swanson for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## I. NATURE OF CASE

Clifford Davlin was convicted, pursuant to jury verdicts, of second degree murder and first degree arson. Davlin was found to be a habitual criminal and sentenced to life imprisonment for the murder conviction and 20 to 60 years' imprisonment for the arson conviction, the sentences to be served consecutively. Davlin appeals, claiming errors in the jury instructions, the State's destruction of physical evidence, the admission of expert testimony on the cause of the fire, the exclusion of evidence proffered by Davlin intended to implicate another suspect, and the finding that Davlin was a habitual criminal.

## II. BACKGROUND

Tamara Ligenza, also known as Tamara Martin, was found dead in her Lincoln apartment after a fire on September 7, 1993. Ligenza was legally blind and was 6 months pregnant at the time of her death. Ligenza had been living with Davlin, but on September 6, Ligenza told Davlin to leave the apartment. The State adduced evidence at trial which generally indicated that Davlin remained at or near the apartment building on September 6 and into the morning of September 7.

Ligenza was last seen alive, by her roommate, at about 1 a.m. on September 7, 1993. Ligenza lived in a house that had been converted to a duplex with one entrance that led to both apartments. Witnesses who lived in the building testified that they were awakened at approximately 4:30 a.m. by reports of a fire in the building. Davlin was identified as being in the duplex at

the time of the fire, staying in the other apartment. Firefighters removed a severely burned body from the bedroom of Ligenza's apartment; the body was later identified by dental records as Ligenza's. An autopsy was performed, and the coroner's physician concluded that Ligenza had been killed by manual strangulation prior to the fire.

Davlin was charged by amended information on March 24, 1997. After a plea in abatement was overruled, Davlin filed an interlocutory appeal that was summarily dismissed by the Nebraska Court of Appeals. See *State v. Davlin*, 6 Neb. App. xliii (case No. A-97-1094, Mar. 27, 1998), *petition for further review overruled* 254 Neb. xxviii (May 29, 1998). Trial commenced on March 10, 2000. In addition to the evidence summarized above, the State presented testimony regarding admissions that Davlin allegedly made regarding his responsibility for Ligenza's death. Two of the witnesses lived in the same apartment building as Davlin after the fire, and one was a cellmate of Davlin in late November and early December 1993 when both were incarcerated in Sarpy County on unrelated charges. The State also adduced evidence that an accelerant had been used to set the fire in Ligenza's apartment.

The jury returned guilty verdicts for second degree murder and first degree arson. Davlin's motion for new trial was overruled, and he was sentenced as set forth above. Other factual details will be set forth below as they relate to the issues presented.

## III. ASSIGNMENTS OF ERROR

Davlin assigns that the district court erred when it (1) retroactively applied this court's decision in *State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998), and did not instruct the jury that malice was an essential element of the crime of second degree murder; (2) instructed the jury that an essential element of the crime of second degree murder was that the killing was done "intentionally, but without *malice*," instead of "premeditation"; (3) failed to provide redress under Neb. Rev. Stat. § 29-1913 (Reissue 1995) because of the State's destruction of evidence required for scientific testing; (4) failed to dismiss the case pursuant to *Arizona v. Youngblood*, 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988), because Davlin's rights under the Due

Process Clauses of the state and federal Constitutions were violated by the State's destruction of evidence; (5) failed to instruct the jury that missing evidence could be inferred to be unfavorable to the State; (6) prohibited the introduction of evidence that a third person committed the charged offenses; (7) admitted the testimony of the State's fire experts with insufficient foundation for the evidence; and (8) found Davlin to be a habitual criminal pursuant to Neb. Rev. Stat. § 29-2221(1) (Reissue 1995).

## IV. STANDARD OF REVIEW

Whether jury instructions given by a trial court are correct is a question of law. *State v. Gartner, ante* p. 153, 638 N.W.2d 849 (2002). The meaning of a statute is a question of law. *Id.* On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *Id.*

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Pruett, ante* p. 99, 638 N.W.2d 809 (2002). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. *State v. Kula,* 260 Neb. 183, 616 N.W.2d 313 (2000). The exercise of judicial discretion is implicit in determinations of relevancy, and a trial court's decision regarding it will not be reversed absent an abuse of discretion. *State v. McLemore,* 261 Neb. 452, 623 N.W.2d 315 (2001). The standard for reviewing the admissibility of expert testimony is abuse of discretion. *State v. Thomas,* 262 Neb. 985, 637 N.W.2d 632 (2002).

## V. ANALYSIS

### 1. JURY INSTRUCTIONS

The district court's instruction No. 3 was a step instruction which included instructions regarding first degree murder, second degree murder, and manslaughter. The instruction stated, in part:

Regarding second degree murder, the elements of the state's case are:

(1) That Clifford J. Davlin caused the death of Tamara Ligenza, a/k/a Tamara Martin; and

(2) that Mr. Davlin did so intentionally, but without malice; and

(3) that Mr. Davlin did so on or about September 7, 1993, in Lancaster County, Nebraska.

(a) Retroactive Application of *Burlison*

■ Davlin's first assignment of error is that the district court erred in not instructing the jury that malice was an element of second degree murder, thus retroactively applying this court's decision in *State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998). We recently addressed this issue in *State v. Redmond*, 262 Neb. 411, 631 N.W.2d 501 (2001), *cert. denied* 534 U.S. 1033, 122 S. Ct. 573, 151 L. Ed. 2d 445. We stated:

Under *Rogers* [*v. Tennessee*, 532 U.S. 451, 121 S. Ct. 1693, 149 L. Ed. 2d 697 (2001)], the U.S. Constitution does not require that retroactive judicial decisions be analyzed with reference to the Ex Post Facto Clause. Instead, a judicial decision interpreting a statute may be applied retroactively unless the decision denies due process by being both unexpected *and* indefensible by reference to the law which had been expressed prior to the conduct in issue.

In this case, the change of law in *State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998), cannot be said to be indefensible. Indefensible is defined as "incapable of being maintained as right or valid" or "incapable of being justified or excused." . . . Thus, in a case such as *Bouie* [*v. City of Columbia*, 378 U.S. 347, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964)], where a court interprets a statute in a surprising manner that has little in the way of legal support, the interpretation could not be applied retroactively. Our decision in *Burlison* was not such a case.

The basis of the *Burlison* decision was the plain language of [Neb. Rev. Stat.] § 28-304 [(Reissue 1995)]. We recognized in *Burlison* that it was improper to read the element of malice into that statute. In Nebraska, all crimes are statutory, and no act is criminal unless the Legislature has in express terms declared it to be so. . . . It is not within the province of

the courts to read a meaning into a statute that is not there, nor read anything direct and plain out of a statute. . . . Thus, as we stated in *Burlison,* our prior decisions interpreting § 28-304 to include malice as a necessary element of the crime of second degree murder were clearly erroneous. Our decision in *Burlison* was in no manner indefensible.

Furthermore, our decision in *Burlison* was not entirely unexpected. Although *Burlison* overruled a line of cases, the prior cases were not without obvious disagreement. Further, this court's interpretation of § 28-304 before *Burlison* was in direct contradiction to the plain meaning of the statute. But regardless of whether the *Burlison* decision was or was not unexpected, it certainly was not indefensible. Thus, under the test set out in *Rogers v. Tennessee,* [532] U.S. [451], 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001), a retroactive application of *Burlison* does not violate due process.

(Emphasis in original.) (Citations omitted.) *Redmond,* 262 Neb. at 420-21, 631 N.W.2d at 508.

Davlin argues that our decision in *Redmond, supra,* was in error because we failed to determine that our decision in *Burlison, supra,* was both unexpected and indefensible. In the first place, our decision in *Redmond* clearly states that our decision in *Burlison* was not unexpected, because the line of cases that *Burlison* overruled was not without obvious disagreement and was in direct contradiction to the plain language of Neb. Rev. Stat. § 28-304 (Reissue 1995).

Second, Davlin misreads *Rogers v. Tennessee,* 532 U.S. 451, 121 S. Ct. 1693, 149 L. Ed. 2d 697 (2001). *Rogers* establishes that a judicial decision interpreting a statute may "not be given retroactive effect, only where it is 'unexpected *and* indefensible.'" (Emphasis supplied.) *Rogers,* 532 U.S. at 462. In other words, *Rogers* sets forth a two-pronged test for whether a retroactive application of a judicial decision violates due process, and both prongs must be satisfied for a constitutional violation to be proved. If one prong of the test is unsatisfied, then the inquiry can end.

Davlin also argues that his case is distinguishable from *State v. Redmond,* 262 Neb. 411, 631 N.W.2d 501 (2001), *cert. denied* 534 U.S. 1033, 122 S. Ct. 573, 151 L. Ed. 2d 445, because the

crime alleged in the instant case took place prior to the line of dissenting opinions that foreshadowed *State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998). Davlin argues that because Ligenza's alleged murder took place before the publication of those dissenting opinions, the decision in *Burlison* was still unexpected at the time the crime was alleged to have been committed.

Davlin's argument fails for two reasons. First, we stated in *Redmond, supra*, that the decision in *Burlison, supra*, was not unexpected both because of the disagreement among the members of this court and because the decisions of this court were contradicted by the plain language of § 28-304. The statutory language upon which *Burlison* was based was obviously in effect at the time that the crime in the instant case was alleged to have been committed.

Moreover, Davlin's argument is directed solely at whether the *Burlison* decision was unexpected. As noted previously, a judicial decision interpreting a statute violates due process when applied retroactively only where the decision is *both* unexpected *and* indefensible. Davlin's argument does not distinguish this case from our conclusion in *Redmond, supra*, that the decision in *Burlison, supra*, was not indefensible. Consequently, Davlin's attempt to distinguish this case from *Redmond, supra*, is without merit.

For the foregoing reasons, the district court did not err in failing to instruct the jury that malice was an essential element of the offense of second degree murder.

### (b) Instruction No. 3

Section 28-304(1) states that "[a] person commits murder in the second degree if he causes the death of a person intentionally, but *without premeditation*." (Emphasis supplied.) As noted above, the district court mistakenly instructed the jury that to convict Davlin of second degree murder, it must find that Davlin caused Ligenza's death "intentionally, but *without malice*." (Emphasis supplied.) Davlin argues, and the State concedes, that the district court's instruction was erroneous in that regard. The district court reached the same conclusion, but determined that the error was harmless. The issue contested on appeal is whether the district court's erroneous instruction requires a new trial.

 We first note that the only objection raised at the jury instruction conference regarding instruction No. 3 related to the retroactive application of *Burlison, supra.* Davlin did not object to instruction No. 3 on any other basis. Failure to object to a jury instruction after it has been submitted to counsel for review precludes raising an objection on appeal absent plain error indicative of a probable miscarriage of justice. *State v. Owens,* 257 Neb. 832, 601 N.W.2d 231 (1999). An objection, based on a specific ground and properly overruled, does not preserve a question for appellate review on any other ground. *State v. Fahlk,* 246 Neb. 834, 524 N.W.2d 39 (1994). In this case, while Davlin complained about the "without malice" element of instruction No. 3 in the context of his motion for new trial, the record does not reflect a timely objection on that basis to the proposed instruction before the case was submitted to the jury.

 However, an appellate court always reserves the right to note plain error which was not complained of at trial. *State v. Hays,* 253 Neb. 467, 570 N.W.2d 823 (1997). Plain error exists where there is error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process. *State v. Palmer,* 257 Neb. 702, 600 N.W.2d 756 (1999). Moreover, it is the duty of a trial judge to instruct the jury on the pertinent law of the case, whether requested to do so or not, and an instruction or instructions which by the omission of certain elements have the effect of withdrawing from the jury an essential issue or element in the case are prejudicially erroneous. *State v. Thomas,* 262 Neb. 985, 637 N.W.2d 632 (2002); *State v. Dixon,* 259 Neb. 976, 614 N.W.2d 288 (2000).

The prejudice inherent in the district court's erroneous instruction is evident when instruction No. 3 is examined with reference to the definitions set forth in instruction No. 4. Instruction No. 4 correctly defined "malice" as that "condition of the mind which is manifested by the intentional doing of a wrongful act without just cause or excuse." See, e.g., *State v. Marks,* 248 Neb. 592, 537 N.W.2d 339 (1995). Thus, the phrase "intentionally, but without malice" instructed the jury that second degree murder must be

intentional, but without a state of mind that is in part characterized by the presence of intent. In essence, the jury was instructed that second degree murder is committed both intentionally and without intent. Arguably, the jury could have concluded that the State was not required to prove an essential element of the offense of second degree murder, i.e., intent.

The effect of this instructional discord was evidenced by the fact that during deliberation, the jury sent the following question to the district court: "Does the word 'malice' in second degree murder refer only to 'premeditated and deliberate malice' as in instruction no. 3 - pg 2?" The district court's answer was that "[t]he word 'malice,' as used in the elements of second degree murder, is defined in Instruction No. 4(4)." While it is impossible to be certain what prompted the jury to ask this question, one potential explanation is that the jury was confused by the conflict between the requirement that second degree murder be intentional and the requirement that second degree murder be without "malice" as defined in the jury instructions.

We are not persuaded by the State's argument that Davlin was not prejudiced because the presence or absence of premeditation is relevant only to the difference between first and second degree murder, and Davlin was convicted of the lesser of those offenses. While this argument might answer Davlin's claim that he was prejudiced by the omission of the words "without premeditation," the State's argument does not address the prejudice created by the insertion of the language that second degree murder be committed intentionally, but "without malice." While malice is not an element of the offense of second degree murder, an instruction to the jury that the State was required to prove, as an element of the offense, that the defendant acted "without malice" creates uncertainty regarding the essential element of intent, which is important to distinguishing between second degree murder and at least one prong of the lesser offense of manslaughter. See, *State v. Redmond*, 262 Neb. 411, 631 N.W.2d 501 (2001), *cert. denied* 534 U.S. 1033, 122 S. Ct. 573, 151 L. Ed. 2d 445; *State v. Jackson*, 258 Neb. 24, 601 N.W.2d 741 (1999).

Because of both the potential for confusion created by the misstated jury instruction No. 3 and the actual confusion exhibited by the question from the jury, we conclude that the district

court's error is of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, and fairness of the judicial process. See *State v. Greer*, 257 Neb. 208, 596 N.W.2d 296 (1999). This plain error on the part of the district court requires that Davlin's conviction for second degree murder be reversed and the cause remanded for a new trial on that charge.

The district court's error with respect to second degree murder, however, does not affect Davlin's conviction and sentence for first degree arson. We therefore proceed to consider Davlin's remaining assignments of error, as they relate to that charge.

### 2. DESTRUCTION OF EVIDENCE

The initial autopsy was performed by Dr. John Porterfield, who subsequently retired, but at the time, was a Lancaster County coroner's physician. Porterfield testified that his initial opinion, after gross inspection of the body, had been that Ligenza died in the fire, but that he changed his mind after seeing microscopic slides and the toxicology report and concluded that Ligenza had been killed by manual strangulation before the fire. The key question underlying this issue is whether or not Ligenza was alive at the time of the fire or was killed before the fire. Davlin contends that examination of Ligenza's larynx and trachea, which were lost, would reveal that Ligenza died in the fire and not before it. Davlin argues that proof Ligenza died in the fire is essential support for Davlin's theory that the fire was not intentionally set, but was an accident caused by Ligenza's smoking in bed.

After the autopsy, Ligenza's body was recalled from the funeral home to be sent to Dr. Thomas Bennett in Iowa for further testing. Dr. Matthias Okoye, another Lancaster County coroner's physician, was responsible for the transfer because Porterfield was out of town at the time. Okoye testified that as a matter of procedure, certain internal organs were removed during autopsies and stored in Formalin in a "gross specimen bucket." Okoye testified that the bucket was available to Bennett, but that Bennett did not ask for it. The larynx and trachea were not with the body when it was delivered to Bennett and have not been found since then. Microscopic slides of sections of the trachea are available, but no slides or photographs of the larynx were taken.

Porterfield testified that the larynx would have been dissected out of the body as a matter of procedure, but that Porterfield did not know what happened to it. Okoye testified that organs stored in Formalin in the gross specimen bucket were kept, in forensic cases, for 3 years, and then were disposed of as a matter of procedure because they represented a biohazard. Okoye testified that he had looked for the bucket in Ligenza's case on request and that it was no longer available. Since the autopsy had been performed in September 1993, Okoye testified that the removed organs would have been routinely destroyed some time in 1996. Okoye testified at trial that the missing evidence might have been in a bag sewn inside the body before the body was sent to the funeral home, but that he did not know if that was the case. Elgin Kuhlman, then a detective sergeant with the criminal division of the Lincoln Police Department, testified at trial that he was the officer who accompanied the body to Iowa for Bennett's examination and that it was his understanding that the larynx had remained at the then Lincoln General Hospital.

The record contains a draft report dictated by Michael Avery, the pathologist's assistant who participated in the autopsy. A typewritten entry on the report indicated Ligenza's aspiration of soot, which would indicate Ligenza was breathing at the time of the fire. This entry on the draft report was crossed out by Porterfield, who testified that he crossed it out because he never made that observation.

The draft also shows a handwritten entry indicating "marked laryngeal edema and blistering," which would be consistent with aspiration of hot gases and death in the fire. This entry was also crossed out by Porterfield, who could not recall why he would have written that observation. Porterfield testified that the routine procedure in preparing such reports was for the pathologist's assistant to prepare and edit a draft report, which was then brought to the coroner's physician for edits and changes that the physician thought appropriate. Porterfield testified at trial that the handwritten entry had been made as he and Avery were going over the report and that Porterfield had made the entry at Avery's suggestion but immediately crossed it out because Porterfield had not made such an observation. Porterfield noted at trial that allergies can cause an edemic look in the larynx and

that mucous in the larynx can be confused with blistering, and he thought that that was what had happened in this case.

In addition, the record contains an affidavit used to obtain a search warrant, in which the averring officer states that Porterfield had concluded that Ligenza had died of a laryngeal spasm as a result of the fire. Porterfield did not recall making a statement to that effect, but again stated that his preliminary conclusion that Ligenza had been killed in the fire was later superseded by closer inspection of the body.

The record contains conflicting evidence regarding the cause of Ligenza's death and the importance of examining the larynx and trachea. Porterfield and Bennett concluded that Ligenza had been killed by manual strangulation prior to the fire. Dr. Robert Bux, deputy chief medical examiner for Bexar County, Texas, was hired by Davlin's counsel and examined the records of Porterfield's and Bennett's autopsies and Okoye's prior testimony. Bux opined that the evidence was insufficient to reach any conclusions regarding the cause of death, but that in his opinion, manual strangulation could not have been the cause of death. Bux stated that he would have liked to examine the larynx for more evidence. Bux testified at trial that he could not rule out a death due to laryngeal spasm because neither the larynx nor photographs of the larynx were available to review.

In contrast, Dr. Robert Gillespie, director of the burn center at the combined University of Nebraska and Clarkson hospitals in Omaha, testified that it was unnecessary to examine the larynx to rule out death by fire or laryngeal spasm. Gillespie was asked by the Lincoln Police Department to examine Ligenza's body at the funeral home. Gillespie testified that based on this examination and his review of the autopsy records, he had concluded that Ligenza was dead before the fire. Gillespie testified that it was unnecessary to examine the larynx because there was no evidence of soot or burns inside the mouth or nose, which ruled out inhalation of hot gases as a cause of death. Gillespie stated that evidence of the inhalation of hot gas would be visible on the microscopic slides of the trachea which had been preserved, but that the slides showed no such evidence. Gillespie also noted the lack of swelling in Ligenza's extremities and the condition of melted blue plastic material found on Ligenza's body; Gillespie

stated that these indicated that during the fire, the skin had no circulation and was unable to respond to the heat. Gillespie testified at trial that the fire had been caused by a flammable liquid.

### (a) § 29-1913

Section 29-1913 provides:

(1) When in any felony prosecution or any prosecution for a misdemeanor or a violation of a city or village ordinance for which imprisonment is a possible penalty, the evidence of the prosecuting authority consists of scientific tests or analyses of ballistics, firearms identification, fingerprints, blood, semen, or other stains, upon motion of the defendant the court where the case is to be tried may order the prosecuting attorney to make available to the defense such evidence necessary to allow the defense to conduct like tests or analyses with its own experts. The order shall specify the time, place, and manner of making such tests or analyses by the defense. Such an order shall not be entered if the tests or analyses by the defense cannot be made because of the natural deterioration of the evidence.

(2) If the evidence necessary to conduct the tests or analyses by the defense is unavailable because of the neglect or intentional alteration by representatives of the prosecuting authority, other than alterations necessary to conduct the initial tests, the tests or analyses by the prosecuting authority shall not be admitted into evidence.

We first note that the only objections raised at trial to the admission of the State's expert medical testimony regarding the cause of Ligenza's death were on the basis of foundation. Davlin made a motion in limine on the basis of § 29-1913 and again presented the issue in the context of his motion for new trial, but did not make a timely objection at trial to the State's evidence on the basis of § 29-1913.

A motion in limine is but a procedural step to prevent prejudicial evidence from reaching the jury; it is not the office of such a motion to obtain a final ruling upon the ultimate admissibility of the evidence; rather, its office is to prevent the proponent of potentially prejudicial matter from displaying it to the jury, making statements about it before the jury, or presenting the

matter to the jury in any manner until the trial court has ruled upon its admissibility in the context of the trial itself. *State v. Merrill*, 252 Neb. 736, 566 N.W.2d 742 (1997). As a consequence, when a court overrules a motion in limine, the movant must object when the particular evidence, previously sought to be excluded by the motion, is offered. *Id.* Because overruling a motion in limine is not a final ruling on the admissibility of evidence and therefore does not present a question for appellate review, a question concerning the admissibility of evidence which is the subject of a motion in limine is raised and preserved for appellate review by an appropriate objection during trial. *Id.*

The relief sought in connection with Davlin's motion in limine was the exclusion of the State's evidence regarding the autopsies conducted on Ligenza's body. As noted, however, Davlin did not object to that evidence at trial on the basis of § 29-1913. An objection, based on a specific ground and properly overruled, does not preserve a question for appellate review on any other ground. *State v. Fahlk*, 246 Neb. 834, 524 N.W.2d 39 (1994). Consequently, Davlin did not properly preserve the issue of whether the evidence should have been excluded on that basis.

We nonetheless observe that even had Davlin properly preserved his claim of error, it would be without merit. Davlin sought to exclude the whole of the State's autopsy evidence on the basis that some parts of the body were unavailable. However, the statutory language clearly refers to exclusion of the "tests or analyses" performed on the evidence that is unavailable to the defense. Consequently, because Ligenza's larynx was unavailable to the defense, the remedy provided by § 29-1913(2) would be to exclude the State's use of tests or analyses of the missing evidence—specifically, the larynx.

Thus, even if the unavailable evidence in this case was within the scope of § 29-1913, the remedy provided by the statute was not the exclusion of the entire autopsy, but simply the exclusion of testing or analysis of the unavailable evidence. The effect of § 29-1913(2) is to level the playing field when evidence is unavailable and prevent the prosecuting authority from making use of evidence that was not available to the defense. As noted above, however, the State's experts did not rely on evidence of the condition of the larynx specifically and based their conclusions on

examination of other parts of the body. Only Porterfield had the opportunity to view the larynx before it was lost, and Porterfield's conclusion that Ligenza died by manual strangulation prior to the fire was based on injuries found by microscopic examination of the strap muscles of the neck, the lack of soot or staining in the mouth and nose, a lack of the cherry red discoloration of internal tissues usually associated with carbon monoxide inhalation, and toxicology reports showing no significant amount of carbon dioxide in the blood. The "tests or analyses" presented by the State at trial did not rely on the evidence that Davlin complains was unavailable. Davlin was not entitled to the broad relief he requested, and the State did not present tests or analyses of the unavailable evidence that would have been subject to exclusion under § 29-1913(2).

Even if Davlin had preserved the issue of exclusion under § 29-1913(2), the district court did not err in refusing to grant Davlin the relief he requested. Compare *Merrill, supra* (objection to exhibit as whole properly overruled where part of exhibit is admissible). Davlin's third assignment of error is without merit.

(b) Due Process

Davlin argues that the charges against him should have been dismissed because his right to due process under the state and federal Constitutions was violated by the State's failure to preserve relevant evidence. Because the due process requirements of Nebraska's Constitution are similar to those of the federal Constitution, we apply the same analysis to Davlin's state and federal constitutional claims. See, *State v. Hookstra, ante* p. 116, 638 N.W.2d 829 (2002); *Marshall v. Wimes*, 261 Neb. 846, 626 N.W.2d 229 (2001).

Under certain circumstances, the Due Process Clause of the 14th Amendment may require that the State preserve potentially exculpatory evidence on behalf of a defendant. *State v. Castor*, 257 Neb. 572, 599 N.W.2d 201 (1999), citing *California v. Trombetta*, 467 U.S. 479, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984). It is uncontroverted, however, that " 'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.' " *Castor*, 257 Neb. at 590,

599 N.W.2d at 214, quoting *Arizona v. Youngblood*, 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988). See, also, *State v. Tanner*, 233 Neb. 893, 448 N.W.2d 586 (1989). A trial court's conclusion that the government did not act in bad faith in destroying potentially useful evidence, so as to deny the defendant due process, is reviewed for clear error. See, *U.S. v. Gomez*, 191 F.3d 1214 (10th Cir. 1999); *U.S. v. Weise*, 89 F.3d 502 (8th Cir. 1996).

In the instant case, the district court's determination that Davlin failed to show bad faith on the part of the State was not clearly erroneous. As set forth above, the record indicates that the missing evidence in this case was destroyed as a matter of routine procedure for medical reasons. This procedure, while certainly unwise in cases where a criminal investigation is ongoing, shows no evidence of bad faith on the part of the State, nor is there any other indication in the record that the missing evidence was misplaced or destroyed in bad faith.

Moreover, Davlin provides no explanation of why the State would have intentionally destroyed the evidence at issue. Even had the missing evidence shown that Ligenza was killed in the fire, instead of before the fire began, the State would still have been able to present evidence that the fire was intentionally set and that Davlin was the person responsible. In other words, while the missing evidence might have changed the State's theory of the case, it would have done little to undermine the evidence presented by the State that established Davlin's culpability for the killing. If anything, Davlin would have been prejudiced, and not exculpated, by the suggestion that Ligenza was alive when doused with a liquid accelerant and set on fire.

Because Davlin did not show that the destruction of the evidence was done in bad faith, he did not show that his constitutional rights to due process were violated by the State's failure to preserve the evidence. The district court's determination to that effect was not clearly erroneous. Davlin's fourth assignment of error is without merit.

### (c) Missing Evidence Instruction

Davlin requested the following jury instruction, which was refused by the district court:

If you find that the state has has [sic] lost evidence important to your determination in this case, then you may infer that the missing evidence would have been unfavorable to the state. However, you are not required to do so. You should consider the degree of negligence or bad faith involved, the importance of the evidence lost, and other evidence that may have been adduce [sic] at trial.

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Thomas*, 262 Neb. 985, 637 N.W.2d 632 (2002). A trial court is not obligated to instruct the jury on matters which are not supported by evidence in the record. *Id.*

The intentional destruction of evidence is usually referred to as "spoliation." See *State v. Langlet*, 283 N.W.2d 330 (Iowa 1979). When spoliation is established, the factfinder may draw the inference that the evidence destroyed was unfavorable to the party responsible for its destruction. *Id.* The rationale of the rule is that intentional destruction amounts to an admission by conduct of the weakness of one's own case; thus, only intentional destruction supports the rationale of the rule. See *id.* An adverse inference drawn from the destruction of evidence is predicated on bad conduct. *U.S. v. Wise*, 221 F.3d 140 (5th Cir. 2000), *cert. denied* 532 U.S. 959, 121 S. Ct. 1488, 149 L. Ed. 2d 375 (2001).

Thus, courts that have considered the issue have generally concluded that the spoliation inference is not appropriate when the destruction was not intentional. See, e.g., *U.S. v. Wise, supra*; *Randolph v. State*, 36 P.3d 424 (Nev. 2001); *Jackson v. State*, 791 So. 2d 830 (Miss. 2001); *Patterson v. State*, 356 Md. 677, 741 A.2d 1119 (1999); *State v. Vanover*, 721 A.2d 430 (R.I. 1998); *State v. Steffes*, 500 N.W.2d 608 (N.D. 1993); *People v. Cooper*, 53 Cal. 3d 771, 809 P.2d 865, 281 Cal. Rptr. 90 (1991) (en banc); *State v. Langlet, supra*; *Torres v. State*, 962 P.2d 3 (Okla. Crim. App. 1998). The same rule has been applied in criminal and civil cases. See, e.g., *Spesco v. General Elec. Co.*, 719 F.2d 233 (7th Cir. 1983). But see, e.g., *State v. Fulminante*, 193 Ariz. 485, 975 P.2d 75 (1999); *Lolly v. State*, 611 A.2d 956 (Del. 1992).

> "It is a general rule that the intentional spoliation or destruction of evidence relevant to a case raises a presumption, or, more properly, an inference, that this evidence would have been unfavorable to the case of the spoliator. *Such a presumption or inference arises, however, only where the spoliation or destruction was intentional and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent.*"

(Emphasis in original.) *Jackson*, 791 So. 2d at 838, quoting *Tolbert v. State*, 511 So. 2d 1368 (Miss. 1987).

The defendant is still permitted, when relevant evidence has been destroyed or is not presented, to use the absence of that evidence against the State. Davlin made such arguments to the jury in this case and used the missing evidence as a basis for cross-examining the State's witnesses and as foundation for the testimony of his own expert witness. Many inferences may be drawn from a missing piece of evidence; however, emphasis on one possible inference, communicated to the jury as part of the court's binding jury instructions, creates the danger that the jury may give that inference undue weight. See *Patterson, supra*. At the very least, a trial judge's jury instruction may have the effect of overemphasizing just one of the many proper inferences that a jury may draw. *Id.* Absent a showing of bad faith on the part of the State, such emphasis is unwarranted.

██ We hold that an instruction on the inference that may be drawn from spoliation of evidence is appropriate only where substantial evidence exists to support findings that the evidence had been in existence, in the possession or under the control of the party against whom the inference may be drawn; that the evidence would have been admissible at trial; and that the party responsible for the destruction of the evidence did so intentionally and in bad faith. See *State v. Langlet*, 283 N.W.2d 330 (Iowa 1979). In the instant case, assuming that Davlin's proffered instruction was a correct statement of the law, Davlin has failed to meet his burden of showing that the instruction was warranted by the evidence.

As discussed above, the record did not indicate that the destruction of the missing evidence was intentional or made in

bad faith. Instead, the record indicates that the evidence was destroyed for safety reasons as a matter of hospital routine. Consequently, the evidence did not support an inference that the destroyed evidence would have been unfavorable to the State, and the district court did not err in refusing Davlin's requested instruction to that effect. Davlin's fifth assignment of error is without merit.

### 3. EXCLUSION OF EVIDENCE

Davlin sought to present evidence that R.G., a resident of the other apartment in the duplex, had been accused of breaking into Ligenza's apartment in July 1993 for the purpose of sexually assaulting another woman, since deceased, who was at the time Ligenza's roommate. During cross-examination of R.G., Davlin sought to question R.G. regarding the allegation. Davlin's offer of proof, generally, indicated that Davlin sought to adduce testimony that Ligenza's former roommate had reported a break-in to the police and that R.G. had been accused. Furthermore, R.G.'s fingerprints were found on a container of charcoal lighter fluid in the shared entryway of the building. R.G. admitted ownership of the charcoal lighter fluid and testified that he used it to grill on the patio. Davlin argued that R.G.'s testimony regarding the allegation would be relevant to R.G.'s motive and opportunity to kill Ligenza. The district court sustained the State's relevancy objection.

It should be noted that although the parties' briefs discuss Neb. Evid. R. 404, the only issue presented at trial was whether the proffered evidence was relevant. On appeal, a party may not assert a different ground for an objection to the admission of evidence than was offered to the trial court. See *State v. Bray*, 243 Neb. 886, 503 N.W.2d 221 (1993). Furthermore, the question whether evidence is relevant for any purpose, pursuant to Neb. Evid. R. 401 and 402, is preliminary to the question whether the evidence is relevant for a proper purpose as determined pursuant to rule 404. See, *State v. Carter*, 255 Neb. 591, 586 N.W.2d 818 (1998); *State v. Freeman*, 253 Neb. 385, 571 N.W.2d 276 (1997). We therefore consider the issue presented to the district court—whether the proffered evidence was relevant.

Evidence is relevant when it has any tendency to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be without the evidence. *State v. Trotter*, 262 Neb. 443, 632 N.W.2d 325 (2001). Evidence may be irrelevant if it is directed at a fact not properly an issue under the substantive law of the case. *State v. Harrold*, 256 Neb. 829, 593 N.W.2d 299 (1999). If evidence fails to alter the probabilities of the existence or nonexistence of a fact in issue, the evidence is irrelevant. *Id.*

Davlin sought to cross-examine R.G. in an attempt to implicate R.G. for killing Ligenza. Obviously, facts which effectively implicated another person for the crime of which Davlin was accused would exculpate Davlin and be relevant to facts at issue in the case. However, the facts Davlin sought to adduce from R.G. did not implicate R.G. in the death of Ligenza and thus were not relevant for that purpose.

Davlin sought to adduce testimony from R.G. that R.G. had been accused of breaking into Ligenza's apartment for the purpose of assaulting Ligenza's former roommate, who was deceased by the time of trial in this case. Davlin did not proffer any evidence establishing that such a break-in had actually taken place, nor did Davlin proffer evidence that R.G. actually committed a break-in or had been charged with such an offense. Davlin only proffered testimony that R.G. had been accused, by someone else, of a break-in directed at Ligenza's former roommate. Even if Davlin proved that the accusation had been made, the existence of such an accusation is simply not relevant to whether someone other than Davlin committed the offenses charged in the instant case.

The district court did not abuse its discretion in excluding Davlin's proffered evidence on the basis of relevance. Davlin's sixth assignment of error is without merit.

### 4. FIRE EXPERTS' TESTIMONY

The State presented testimony from Ken Scurto, a fire investigator for the State Fire Marshal's office, and Brian Nehe, who was then a fire inspector for the city of Lincoln. Both opined that the fire in this case started on the mattress in the bedroom and was intentionally set. Scurto had been trained in fire investigation, including several classes at the National Fire

Academy in Emmitsburg, Maryland. Scurto testified that he was an expert in fire investigation and postblast scene investigation. Nehe testified that he had been trained as a fire investigator by the National Fire Academy and at seminars provided by the International Association of Arson Investigators; the Bureau of Alcohol, Tobacco, and Firearms; and the Omaha Fire Department.

Scurto stated that he arrived at the scene of this fire before any debris had been removed from the room. Scurto testified that based on the heat lines visible throughout the bedroom, he determined that the fire centered on the bed. Scurto observed that the carpet was generally intact and that nothing was wrong with the building's furnace. He noted the absence of reactive chemicals, the lack of explosives or explosive devices, and the lack of evidence of any electrical source of ignition. The mattress, however, was almost completely consumed except for the springs and metal frame.

Scurto testified that after a 3- or 4-hour observation of the room, he and Nehe obtained a search warrant because they felt they had eliminated accidental sources of ignition for the fire. Scurto concluded, because the mattress was too fully consumed and because the fire had burned too hot for an accidental fire given the available fuel, that the fire had started on the bed and had been intentionally set.

Scurto specifically testified that there was no smoke damage in the room that was consistent with the smoldering fire that would have been expected from an accident such as smoking in bed. Scurto stated that because of the severe fire damage to the mattress and body, the fire must have been quick and hot and could not have been a smoldering fire.

Scurto further testified that the pattern of heat concentration around the center of the mattress meant something had concentrated the heat and that the pattern indicated an ignitable liquid. The State also presented evidence that accelerant traces were found on samples of material taken from the mattress and bedroom and that the traces were chemically very similar to the container of charcoal lighter fluid found in the building entranceway.

Nehe testified that it was evident from the burn damage in the room that the fire had started on the bed. Nehe confirmed

Scurto's testimony that there was not evidence of the soot and smoke that would be expected from a fire started by a cigarette. Nehe stated that the damage and fire patterns pointed to the bed as the area of origin and that the fire had burned too quickly for an ordinary mattress fire; thus, in his opinion, the fire had been started intentionally.

We first note that at trial, Davlin's objections to the opinion testimony of Scurto and Nehe were general objections on the basis of insufficient foundation and did not specify which aspects of foundation Davlin thought were lacking. Given several hundred transcribed pages of foundational testimony, Davlin's general objections are far from helpful. If a general objection on the basis of insufficient foundation is overruled, the objecting party may not complain on appeal unless (1) the ground for exclusion was obvious without stating it or (2) the evidence was not admissible for any purpose. *State v. Baker*, 245 Neb. 153, 511 N.W.2d 757 (1994). Neither of those criteria is met in the instant case, and it is not the function of an appellate court to scour a sizable record looking for unidentified foundational defects.

Even when the inquiry is confined to the argument set forth in Davlin's appellate brief, it is evident that Davlin's complaints go to the weight, and not the admissibility, of the questioned testimony. Davlin argues primarily that Scurto and Nehe formed their opinions without considering certain evidence that was found at the scene of the fire, particularly a cigarette lighter, aerosol can, and foam that may have come from a polyurethane mattress. Davlin also argues that Scurto and Nehe did not properly consider the fact that Ligenza was a smoker.

An expert must possess facts which enable him or her to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture. *State v. Canbaz*, 259 Neb. 583, 611 N.W.2d 395 (2000). As a general rule, however, the opinion of an expert witness is properly admitted into evidence where the basis of the opinion and the facts on which it is based are before the jury, and the opposing party has the opportunity to cross-examine the witness as to these foundational matters. See, *State v. Trevino*, 230 Neb. 494, 432 N.W.2d 503 (1988); *State v. Miner*, 216 Neb. 309, 343 N.W.2d 899

(1984). An appellate court is not a superexpert and will not lay down categorically which factors and principles an expert may or may not consider; such matters go to the weight and credibility of the opinion itself and not to its admissibility. See, *Nebraska Nutrients v. Shepherd*, 261 Neb. 723, 626 N.W.2d 472 (2001); *Lange v. Crouse Cartage Co.*, 253 Neb. 718, 572 N.W.2d 351 (1998).

Our review of the record leads us to conclude that the opinions of Scurto and Nehe were adequately supported by the foundation summarized above. The fact that there is evidence in the record that could lead to a different conclusion does not render the opinions inadmissible; rather, it provided Davlin with a basis for cross-examination of the expert witnesses and argument to the jury regarding the weight to be given to their opinions. Davlin presented no expert testimony to either contradict the conclusions reached by Scurto and Nehe or criticize the way in which Scurto and Nehe reached those conclusions.

Considering all of the circumstances, we cannot say the district court abused its discretion in overruling Davlin's general objections to the foundation for the testimony of Scurto and Nehe. Davlin's attacks on that foundation were properly directed at the weight to be given the testimony by the trier of fact, and not the admissibility of the evidence. Davlin's seventh assignment of error is without merit.

## 5. HABITUAL CRIMINAL

Section 29-2221(1) provides, as relevant:

> Whoever has been twice convicted of a crime, sentenced, and committed to prison, in this or any other state or by the United States or once in this state and once at least in any other state or by the United States, for terms of not less than one year each shall, upon conviction of a felony committed in this state, be deemed to be an habitual criminal and shall be punished by imprisonment in a Department of Correctional Services adult correctional facility for a mandatory minimum term of ten years and a maximum term of not more than sixty years . . . .

One of the felonies on which the district court's habitual criminal finding was based in the instant case was a 1981 Iowa

conviction for sexual assault in the second degree. With respect to the term of imprisonment, the sentencing order provides that Davlin was committed to the Iowa Division of Adult Corrections "for a period not to exceed twenty-five years." Because the Iowa sentence did not specify a minimum term, Davlin argues that it is not a sentence for a term of "not less than one year" within the meaning of § 29-2221(1).

The statutory reference in § 29-2221(1) is to the "term" to which a defendant is sentenced, not the time or number of days the defendant is actually incarcerated. Therefore, it is the term of a defendant's prior sentences, not time actually served, which controls applicability of the habitual criminal penalty. *State v. Jackson*, 225 Neb. 843, 408 N.W.2d 720 (1987), *overruled on other grounds, State v. Garza*, 236 Neb. 202, 459 N.W.2d 739 (1990).

In *State v. Luna*, 211 Neb. 630, 319 N.W.2d 737 (1982), the defendant was sentenced as a habitual criminal on the basis of two convictions, one from Idaho and one from Oregon, neither of which established a minimum term of at least 1 year. This court affirmed the sentence, stating:

> The habitual criminal act is not a separate offense but, by its terms, provides for the enhancement of the sentence on the principal charge with a minimum sentence of 10 years and a maximum sentence of 60 years for each conviction committed by one found to be an habitual criminal even though, absent conviction as an habitual criminal, the minimum or maximum sentence might be less. . . .
>
> . . . [I]t is clear the fact that the Idaho and Oregon sentences and commitments do not set a minimum of at least 1 year does not disqualify them from consideration in determining whether defendant is an habitual criminal. The statute provides only that a pardon on the basis of innocence results in the exclusion of a conviction and commitment of at least a year. No showing was made that defendant was pardoned by either Idaho or Oregon for any reason whatsoever.

We agree with the rationale of *Haley v. Hollowell*, 208 Iowa 1205, 227 N.W. 165 (1929), that a prior sentence of 1 to 7 years' imprisonment satisfied Iowa's habitual crimi-

nal statute's requirement that a prior sentence be for a term of "not less than three years," inasmuch as the defendant "might have served the full seven years." We find no error in this case. The proceedings before the trial court were fair and reasonable and established defendant's identity as an habitual offender. We determine that the judgment of the trial court must be affirmed.

(Citations omitted.) *Luna*, 211 Neb. at 635, 319 N.W.2d at 740.

Davlin concedes that *Luna* is controlling in the instant case and suggests that *Luna* should be overruled. We decline to do so. Based on *Luna*, the district court did not err in relying on Davlin's Iowa conviction in sentencing Davlin as a habitual criminal. Davlin's final assignment of error is without merit.

## VI. CONCLUSION

Because the district court committed plain error in incorrectly instructing the jury on the essential elements of second degree murder, Davlin's conviction on that count is reversed and the cause is remanded for a new trial consistent with this opinion. We note that because the jury acquitted Davlin of first degree murder, the Double Jeopardy Clause bars the State from retrying Davlin for that offense, but does not prevent the State from proceeding with a new trial on a charge of second degree murder, as the evidence at this trial was sufficient to support Davlin's conviction. See, *State v. Sheets*, 260 Neb. 325, 618 N.W.2d 117 (2000), *cert. denied* 532 U.S. 1019, 121 S. Ct. 1957, 149 L. Ed. 2d 753 (2001); *State v. White*, 254 Neb. 566, 577 N.W.2d 741 (1998). Because Davlin's other assignments of error are without merit, his conviction for first degree arson and resultant sentence of 20 to 60 years' imprisonment are affirmed.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED FOR A NEW TRIAL.