IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

STATE V. GOMEZ

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,
V.
JEFFREY A. GOMEZ, APPELLANT.

Filed September 9, 2014.    No. A-13-655.

Appeal from the District Court for Polk County: MICHAEL J. OWENS, Judge. Affirmed.

Bruce E. Stephens, of Stephens Law Offices, P.C., L.L.O., for appellant.

Jon Bruning, Attorney General, and Kimberly A. Klein for appellee.

INBODY, Chief Judge, and IRWIN and BISHOP, Judges.

IRWIN, Judge.

## I. INTRODUCTION

Jeffrey A. Gomez appeals his convictions and sentences on charges of first degree sexual assault of a child, child abuse, and third degree sexual assault of a child. On appeal, Gomez challenges rulings of the district court for Polk County on Gomez' motion for bill of particulars, on Gomez' various objections during trial, in allowing a particular expert to testify, in allowing the State's rebuttal witness to listen to Gomez' expert testimony, and in sentencing Gomez. In addition, Gomez asserts that there was not sufficient evidence to support his convictions. We find no merit to Gomez' assertions on appeal, and we affirm.

## II. BACKGROUND

Gomez was initially charged by information with one count of first degree sexual assault of a child who was at least 12 years of age but less than 16 years of age while Gomez was 25 years of age or older and one count of child abuse. Over time, the information was amended on multiple occasions and, at various times, included a variety of allegations of first degree sexual assault of a child, incest, child abuse, second or third degree sexual assault of a child, and

- 1 -

displaying of obscene materials to a minor. At times, the operative information included as many as 18 charges. The charges generally concerned allegations that Gomez had sexually abused his daughter, N.G., and that he had subjected her to cruel punishment.

Ultimately, Gomez was brought to trial on a fifth amended information, which alleged five counts: one count of first degree sexual assault of a child who was at least 12 years of age but less than 16 years of age while Gomez was 25 years of age or older, two counts of child abuse, and two counts of third degree sexual assault of a child. The events alleged in the operative information all allegedly occurred between May and September 2011. N.G. was born in June 1997, and Gomez was born in March 1976.

In September 2011, the Polk County sheriff's office received a Department of Health and Human Services (DHHS) intake report indicating that DHHS had received a report about potential abuse or neglect. The intake report indicated that N.G., the victim in this case, had "made a statement to somebody that her dad wanted to have sex with her, and if she couldn't have sex then she was to go between his legs." The Osceola Public Schools also contacted the Polk County sheriff's office and indicated that N.G. had made statements that "her dad had said some things to her" that the school staff had found disturbing.

Chief Deputy Robert Carey accompanied N.G. to the Child Advocacy Center in Lincoln, Nebraska. At the Child Advocacy Center, N.G. was assigned a legal advocate and was interviewed by a forensic interviewer, while Deputy Carey watched the interview in a closed circuit viewing room.

Deputy Carey testified that during that interview, N.G. indicated that she "had never had sex with her father" and that when Gomez "had said some things to her of a sexual nature, that she walked out of the room and nothing had ever happened." He testified that when N.G. was specifically asked if Gomez had tried to have sex with her, her answer was "no." He testified, however, that N.G. said during the interview that Gomez "wanted to have sex with her," that he "[t]old her he was going to as a punishment," and that when Gomez hugged her, he "would reach down between her legs" and would rub her vagina.

Deputy Carey also testified that N.G. had indicated during the interview that Gomez had never struck her with a stick. He testified, however, that he believed that N.G. had indicated that she had been threatened with a stick.

Deputy Carey and an investigator from DHHS then made contact with Gomez, informed him that there had been an allegation made against him, and asked him to go to the sheriff's office to discuss the allegation with Deputy Carey. Gomez went to the sheriff's office and was interviewed by Deputy Carey and the DHHS investigator. Deputy Carey testified that Gomez denied ever having sexual contact with N.G. and denied saying that he wanted to have sex with N.G. and that Gomez indicated that "there was some conversations or statements he may have made to [N.G.] that might have been misconstrued."

Deputy Carey testified that Gomez' responses during the interview were concerning, that Gomez did not "seem to be too upset about [having] his kids [taken] into protective custody, and that his daughter just got done having a talk with a forensic interviewer about him wanting to have sex with her." Deputy Carey testified that he "thought [Gomez] would have been a little upset about this." Deputy Carey testified that, instead, Gomez "wasn't really anything. He wasn't excited, wasn't mad, wasn't happy. Just pretty much monotone throughout the whole interview."

A couple of months thereafter, N.G.'s therapist contacted Deputy Carey. The therapist indicated that N.G. had "conveyed some stuff during a session," and Deputy Carey obtained a subpoena to review the information. Based on the information, Deputy Carey obtained an arrest warrant and a search warrant.

Upon execution of the search warrant, law enforcement seized "a laptop computer, a cell phone, a camera, and a Kendo stick."

Subsequently, N.G.'s "Facebook" account user name and password were obtained. Deputy Carey used that information to review and print a conversation on N.G.'s Facebook account between N.G. and Gomez. N.G. later testified about the contents of the message, as set forth below. On cross-examination, Deputy Carey acknowledged that anyone who was able to log into the Facebook accounts of either N.G. or Gomez could send messages that would appear to be from N.G. or Gomez. He testified that he had not asked Gomez about whether he was the author of any of the messages and that he could not say that Gomez had authored the messages that were indicated as coming from him.

N.G. was interviewed a second time at the Child Advocacy Center. The interviewer testified that N.G. was "more familiar with [the interviewer] and the Child Advocacy Center, so she was more open the second time around." The interviewer agreed that N.G.'s statements and allegations made during the second interview differed substantially from her statements and allegations made during the first interview. She testified that there were also similarities, however, including similarities "in the things that [N.G.] was saying that [Gomez] did," but that "[s]he provided additional information [in the second interview] as opposed to the first one."

N.G. testified at the trial. She testified about her childhood, including time that she lived in Washington state prior to moving to Nebraska. She testified that she sometimes got into trouble and that Gomez would punish her by hitting her with a belt, with her clothes on. She testified that Gomez sometimes used "a stick" to punish her. She testified that the family moved to Nebraska during the summer of 2009. She testified that after they moved to Nebraska, Gomez would sometimes punish her by hitting her with his belt, usually with her clothes on, but at least once with her clothes off.

N.G. testified that around Halloween 2010, she had a good relationship with Gomez. She testified, "We loved each other. Nothing bad really happened between us." She testified, however, that after Thanksgiving, Gomez began "touching [her] in [her] vagina" as part of her bedtime routine. She testified that it happened "almost every night." She testified that she told the interviewer in both her first and second interview at the Child Advocacy Center about Gomez' rubbing her vagina and that it was "very uncomfortable."

N.G. testified that in the spring of 2011, Gomez spanked her with his hand, with her clothes off. She testified that in May 2011, she told Gomez she did not want him to hit her on her bare bottom and that he indicated that, as another form of punishment, "[h]e said he would kiss [her] on [her] bottom." She testified that Gomez told her this in his bedroom, which is "where he wanted to do the punishment," and that he talked to her about not doing her chores correctly.

According to N.G., Gomez told her "to take [her] pants and underwear off. Um, he had [her] get in a position on his bed; [she] had to have [her] knees spread apart, [she] had to bend forward with [her] hands out to the side and [her] face had to be in the bed." She testified that Gomez then "started kissing [her] bottom" and that he used his tongue when he did so. She

testified that he kissed her bottom "everywhere" using his tongue, including all over and all around her anus. When asked if that was "the usual way then that [Gomez] punished [her] during the months of May and June of 2011," N.G. testified, "Yes." She testified that it continued to happen in July and August and that it happened more than once. She testified that it generally occurred on Friday or Saturday nights. She testified that she told the interviewer about the punishments during both interviews at the Child Advocacy Center and described the punishments during the second interview.

N.G. testified that she would attempt to get out of that punishment by telling Gomez she was "on [her] period" or by trying to get invitations to spend the night with friends. She testified that on one occasion between May and the end of August 2011, she attempted to get out of the punishment by telling Gomez that "something was leaking out of [her] privates." She testified that on that occasion, Gomez instructed her to let him look at it, and that "he basically stuck his thumb in [her] vagina. And he told [her] that there was nothing in there." According to N.G., Gomez then "went on with the punishment . . . where he kissed [her] bottom."

N.G. testified that during the summer of 2011, Gomez said to her, "I want to fuck you until I want to stop." She testified that Gomez had previously made her watch a pornographic movie of a man and woman having sex. N.G. testified that she told Gomez that she did not want to lose her virginity and that she did not want him "to be [her] child's dad." N.G. testified that she told the interviewer about Gomez' comment during both her first and her second interview at the Child Advocacy Center.

N.G. testified that after the conversation where Gomez indicated that he wanted to have sex with her, she went to a dance at the fairgrounds with two of her friends. She testified that she was upset at the dance and cried and that her friends saw her crying.

One of the two friends who had accompanied N.G. to the fair testified that while they were at the fair, N.G. had told her something that was disturbing to her. When the friend was asked what N.G. had said, Gomez' counsel objected that the requested testimony would be hearsay. The State responded that the testimony was being elicited "for the effect on the [hearer], and also to rebut any recent allegations of recent fabrication." The court overruled the objection, and the friend testified that N.G. had been "afraid of what [Gomez] might do if she was late or didn't do, like a chore or something. And she was afraid that he might hurt her."

Gomez' counsel again objected and requested a sidebar. During the sidebar, N.G.'s counsel objected that the testimony could not be offered to rebut an allegation of recent fabrication because there had not yet been offered any statement from N.G. that Gomez had asserted was fabricated. The State argued that the statement was admissible because of its effect on the hearer, but also argued that Gomez' counsel had "brought [fabrication] up in his opening statement." The court agreed that "it matters that [counsel] brought it up in opening" and expressed its belief that Gomez' "whole argument" was that N.G. was not telling the truth, and the court affirmed its overruling of Gomez' objection.

N.G. testified that it had not been easy for her to talk about the incidents during the first interview at the Child Advocacy Center, but that she finished telling them everything that had happened during the second interview.

N.G. was asked about her Facebook messages exchanged with Gomez. She was asked about one message, from August 2011, in which Gomez had said to her, "If you're not red, we'll

get the punishment out of the way." N.G. was asked to tell the jury what Gomez' statement meant, and Gomez' counsel objected on the basis of a lack of foundation. The court sustained the objection.

N.G. was then asked several questions about when she received the message, whether she recognized it, whether the exhibit depicting the message was an accurate representation of the message, and how she could identify who had sent the message. She was then asked if she knew what was meant by the statement, "If you're not red." She indicated that she did know what was meant, and was asked to tell the jury what it meant. Gomez' counsel again objected that the question called "for speculation and interpretation as to what the statement meant." The court again sustained the objection.

The State then asked N.G., "Did you have an understanding yourself of what it means to say, 'If you're not red?'" She indicated that she did, and the State asked her to tell the jury what it meant to her. Gomez' counsel again objected, but the court overruled the objection. N.G. testified, "So when he says 'if you're not red,' it means if I'm off my period."

N.G. testified that she felt safe that she would not be "punished" when she was on her period and that she sometimes told Gomez she was on her period when she was not, to try to avoid being punished.

On cross-examination, N.G. testified that she had only ever told one friend about Gomez' doing inappropriate things with her sexually. She testified that she never told any adult about it. She testified that when she went to the fair with her friends during the summer of 2011, she did not tell them that Gomez had done anything inappropriate in a sexual way, but that she did tell them that Gomez wanted to have sex with her.

N.G. acknowledged that in her first interview at the Child Advocacy Center, she had not said anything about Gomez' touching her vagina with his thumb. She acknowledged that in her second interview at the Child Advocacy Center, she had said something about Gomez' touching her vagina with his thumb but that his thumb had not gone inside her vagina. In her testimony at trial, she had indicated that he put his thumb in her vagina.

She also acknowledged that during her first interview at the Child Advocacy Center, she had indicated that Gomez had never licked her in her private parts and had never spanked her. She acknowledged that during the interview, she had indicated that Gomez never took her clothes off and had not talked to her about her period. She acknowledged that during the interview, she had indicated that Gomez "wanted to" do the things she had talked about as punishments but that "[h]e never got the chance to . . . [b]ecause [she] just walked away from it."

The jury returned verdicts finding Gomez guilty on all charges. He was sentenced, and he now appeals to this court.

## III. ASSIGNMENTS OF ERROR

Gomez has assigned eight errors. First, Gomez assigns as error that the district court erred in overruling his pretrial motion for bill of particulars. Second, Gomez assigns that "[t]he court erred in several of its rulings on [Gomez'] objections, the totality of which denied [him] a fair trial." Third, Gomez assigns that the "court erred in allowing an expert to testify who had never seen the victim or any reports." Fourth, Gomez assigns that "[t]he court erred in lifting the sequestration order in the middle of trial" and in allowing the State's rebuttal witness to listen to

the testimony of Gomez' expert witness. Fifth, Gomez assigns that the "court erred in allowing an undisclosed expert to testify." Sixth, Gomez assigns that the court erred in its application of Neb. Rev. Stat. § 28-319.01 (Cum. Supp. 2012) with regard to sentencing. Seventh, Gomez assigns that "[t]here was insufficient evidence with which to convict" him. Finally, Gomez assigns that the "court erred in overruling [his] motion for new trial."

IV. ANALYSIS

1. BILL OF PARTICULARS

Gomez first asserts that "[t]he court erred in overruling [his] Motion for Bill of Particulars." He argues that he was not provided sufficient notice of the charges brought against him to allow him to meaningfully prepare a defense, that he was not provided sufficient notice to allow him to plead any conviction as a bar in later prosecutions, and that he was not provided sufficient notice to allow him to prepare an alibi defense. We find no merit to Gomez' assertions regarding this assignment of error.

The function of an information is twofold: With reasonable certainty, an information must inform the accused of the crime charged so that the accused may prepare a defense to the prosecution and, if convicted, be able to plead the judgment of conviction on such charge as a bar to a later prosecution for the same offense. *State v. Van*, 268 Neb. 814, 688 N.W.2d 600 (2004). An information must apprise a defendant with reasonable certainty of the charges against him so that he may prepare a defense to the prosecution and be able to plead a judgment of conviction as a bar to a later prosecution for the same offense. *State v. Case*, 4 Neb. App. 885, 553 N.W.2d 173 (1996). An information which alleges the commission of a crime using the language of the statute which defines the crime is generally sufficient. *Id.*

After the State filed the fourth amended information in this case, which charged Gomez with a total of 18 counts, including 6 counts of child abuse and 10 counts of third degree sexual assault of a child, Gomez filed a motion for bill of particulars. In the motion, Gomez asserted that the fourth amended information was insufficient with respect to the locations, dates, and times of the offenses and that with respect to the child abuse and third degree sexual assault of a child counts, it was insufficient with respect to indicating the specific acts which the State was alleging constituted the various offenses.

At a hearing on the motion, Gomez' counsel argued that the fourth amended information provided insufficient information to Gomez to allow him to know what to prepare to defend himself against, argued that it hampered his ability to prepare an alibi defense, and argued that there would be no way for him to plead a conviction as a bar to later prosecution because there was not sufficient specificity about the various offenses. The State argued that it had sufficiently alleged offenses within a specific time period and that it had charged Gomez in the language of the relevant statutes.

The district court issued an order in which it, in part, granted Gomez' motion for bill of particulars. With respect to the charge of first degree sexual assault of a child, the court held that the fourth amended information was sufficient. With respect to the remaining counts, which included the various child abuse and third degree sexual assault of a child charges, the court ordered the State either to provide Gomez with a bill of particulars or to further amend the operative information.

- 6 -

In response, the State filed a fifth amended information. In the fifth amended information, the State reduced the total number of charges from 18 to 5. With respect to the first degree sexual assault of a child charge, the State alleged that Gomez, while 25 years of age or older, had subjected N.G., while at least 12 years of age but less than 16 years of age, to sexual penetration between May 1 and September 9, 2011, in Polk County, Nebraska. The State then alleged that between May 1 and June 30, 2011, Gomez had knowingly or intentionally caused or permitted N.G. to be cruelly punished and had subjected her to sexual contact while Gomez was 19 years of age or older. The State then alleged that between July 1 and September 9, 2011, Gomez had knowingly or intentionally caused or permitted N.G. to be cruelly punished and had subjected her to sexual contact while Gomez was 19 years of age or older.

At a subsequent hearing, Gomez reasserted his arguments concerning the need for a bill of particulars, this time with respect to the fifth amended information. The court ruled that it had "already dealt with those issues" and denied his further request for a bill of particulars.

Our review of the record suggests that the district court actually granted Gomez' motion for bill of particulars. The motion that appears in the transcript presented on appeal was directed to the fourth amended information, and the court ordered the State either to provide a bill of particulars or to file an amended information. The State filed an amended information. To the extent Gomez' arguments on appeal are based on his reassertion of the grounds for the motion for bill of particulars directed at the fifth amended information, we find no merit to his arguments.

On appeal, Gomez argues that N.G. "made allegations of many occasions of abuse . . . and claimed that this happened almost every night" after the first instance of sexual contact. Brief for appellant at 23. He argues that he could not properly "prepare for cross examination [or prepare a defense] because [he] had no way of knowing when these allegations were supposedly taking place." Brief for appellant at 23.

Generally, to charge a defendant with the commission of a criminal offense, the information must allege each statutorily essential element of the crime charged, expressed in the words of the statute which prohibits the conduct charged as a crime, or in language equivalent to the statutory terms defining the crime charged. *State v. Van*, 268 Neb. 814, 688 N.W.2d 600 (2004). Where the information alleges the commission of a crime using language of the statute defining that crime or terms equivalent to such statutory definition, the charge is sufficient. *Id.* However, when the charging of a crime in the language of the statute leaves the information insufficient to reasonably inform the defendant as to the nature of the crime charged, additional averments must be included to meet the requirements of due process. *Id.* Nonetheless, an information is deemed sufficient unless it is so defective that by no construction can it be said to charge the offense of which the accused was convicted. *Id.*

We have previously noted that to the extent a defendant's motion for bill of particulars is an effort to correct alleged inadequacies in the information for purposes of preparing an adequate defense, a motion to quash is the proper method of attack. *State v. Case*, 4 Neb. App. 885, 553 N.W.2d 173 (1996). In this case, the record presented to us on appeal does not contain any motion to quash. In Nebraska, the rule is that all defects which may be excepted to by a motion to quash are considered waived by a defendant who enters a plea to the general issue. Neb. Rev. Stat. § 29-1812 (Reissue 2008).

Even assuming that a motion for bill of particulars is sufficient to raise the issue and not consider it waived, the Nebraska Supreme Court has clearly held that an information is sufficient where it alleges the commission of a crime using language of the statute defining that crime or terms equivalent to such statutory definition. *State v. Davlin*, 272 Neb. 139, 719 N.W.2d 243 (2006); *State v. Van, supra*. We cannot say that the fifth amended information was "so defective that by no construction can it be said to charge the offense[s] of which [Gomez] was convicted." See *State v. Van, supra*. We find this assertion to be without merit.

On appeal, Gomez also argues that "[b]ased upon the evidence at trial the State could come back and charge [him] with 30 or 40 more counts of the exact same charge because we have no way of determining whether those charges would be barred by the former adjudication or not." Brief for appellant at 23.

In *State v. Martinez*, 250 Neb. 597, 550 N.W.2d 655 (1996), the Nebraska Supreme Court specifically addressed the issue of the required specificity of pleading in sexual assault cases for purposes of double jeopardy protection. In that case, the court recognized that because sexual assaults on minors are typically unwitnessed and can leave little or no physical evidence, prosecutors are often left to base the State's case largely on the testimony of the minor victim, who is often unsure of the particular date on which an assault or assaults occurred. The court recognized that the problem is particularly true when a child has been assaulted on a regular basis and in a consistent manner and noted that the more frequent and repetitive the assaults and the younger the victim, the more this problem is exacerbated. *Id.*

In *Martinez*, the court noted that requiring the State to allege a specific date, rather than a timeframe, would effectively insulate the most vicious offenders and would be a policy that, by its very definition, would be unconscionable. Thus, the court specifically concluded that a trial court involved in a subsequent prosecution may tailor double jeopardy protection to reflect the time period involved in the charge in the first prosecution. *Id.*

The State may allege a timeframe for its allegations of sexual assault of a child in its first prosecution; as a quid pro quo to ensure that this liberty is not abused, the State must survive double jeopardy scrutiny if it attempts a second prosecution based upon the same transaction during the same timeframe. *State v. Martinez, supra*. Unless the offense charged in the second prosecution is clearly separate and apart from the offense charged in the first prosecution, the timeframe alleged in the first prosecution acts as a "blanket bar" for subsequent prosecutions. *Id.* This balances the profound tension between the constitutional rights of one accused of child molestation against the State's interest in protecting those victims who need the most protection. *Id.*

In *State v. Martinez*, 250 Neb. at 599, 550 N.W.2d at 657, the court concluded that an information alleging that the defendant had committed "a first degree sexual assault against [the victim] 'between July 1, 1991 and June 18, 1994'" was constitutionally sufficient. The Supreme Court rejected the defendant's argument that this timeframe was insufficient to allow him to plead a conviction as a bar to a later prosecution and concluded that the information "passed constitutional muster." *Id.* at 602, 550 N.W.2d at 659.

In the present case, after Gomez filed his motion for bill of particulars and complained that the fourth amended information provided insufficient detail, the State filed a fifth amended information. The operative pleading in this case alleged one count of first degree sexual assault

had occurred between May 1 and September 9, 2011; alleged one count of child abuse and one count of third degree sexual assault had occurred between May 1 and June 30, 2011; and alleged one count of child abuse and one count of third degree sexual assault had occurred between July 1 and September 9, 2011. Gomez' argument that such pleading prevents him from being able to plead his convictions as a bar to later prosecutions for other offenses occurring during these time periods is meritless.

Finally, Gomez argues on appeal that the operative pleading provided him insufficient notice to allow him to present an alibi defense.

Neb. Rev. Stat. § 29-1927 (Reissue 2008) requires a defendant wishing to present evidence of an alibi defense to file notice of such intention at least 30 days before trial. The record presented to us on appeal does not contain any such notice. We note that Gomez' counsel did argue the inability to prepare an alibi defense at the hearing on his motion for bill of particulars.

In this case, as we have already concluded above, the information was sufficiently specific to satisfy constitutional requirements. Gomez' assertion that an information charging instances of sexual assault during a timeframe, rather than on a specific date, makes attempting to assert an alibi more difficult, we note that the same difficulty was certainly present in *State v. Martinez, supra*, where the defendant was charged with committing an offense at some point during a nearly 3-year timeframe. Gomez has not demonstrated how his difficulty was any more substantial than in any case where the State has charged a defendant based on a timeframe, which charging has specifically been held sufficient to satisfy constitutional requirements. We find no merit to this assertion.

2. GOMEZ' OBJECTIONS

Gomez next asserts that "[t]he court erred in several of its rulings on [Gomez'] objections, the totality of which denied [Gomez] a fair trial." Gomez argues that the court erred in its rulings regarding admission of his interview, questions about the victim's Facebook account, alleged hearsay testimony of a witness, the victim's interpretation of a statement made by Gomez in a Facebook message to her, and testimony about why a report was made to DHHS. We find no merit to Gomez' assertion that there was error or that it, cumulatively, deprived him of a fair trial.

We first note that although Gomez' assigned error is not that any of these alleged erroneous rulings on its own would merit reversal, but, rather, that "[t]he sum of these errors was to deny [him] due process." Brief for appellant at 28. Gomez never argues why the sum of these alleged errors deprived him of a fair trial, instead only arguing each individual assertion constituted error and then concluding that all of them together amounted to a due process violation.

(a) Admission of Gomez' Interview

On appeal, Gomez first argues that the district court erred in accepting the State's offer of Exhibit 6, an audio recording of the interview of Gomez. Specifically, he argues on appeal that at trial he "objected in regards to the portion [of the interview] that referred to [Gomez'] drug use" and that "[t]he court accepted the exhibit over [his] objection." Brief for appellant at 24. He

argues that it was "error on the part of the court to accept the exhibit or to do so without a limiting instruction." *Id.* at 25.

Our review of the trial record indicates that when the State offered the exhibit, Gomez' counsel objected that "[the] exhibit contains questioning of improper nature regarding drug use by . . . Gomez" and requested that "[t]hat portion should be redacted and not published to the jury." The State responded that it already had "redacted all the portions about marijuana" and asked if there was some section of the interview where redacting had not been done. Gomez' counsel represented that he "thought it was still there . . . but [he] only had it once to play it." The State then offered to "go back and review it to make sure" and represented that it had "intended to redact that." The court then took a break to allow the State to review the exhibit and make sure that references to drug usage had been redacted. After the break, the State reoffered the exhibit and the court received it. Gomez' counsel did not raise any additional objection before the exhibit was published to the jury, did not raise any objection during the exhibit's publication, and did not raise any objection after the exhibit had been published to the jury.

Gomez' brief on appeal leaves the distinct impression that the interview contained references to drug usage, that he objected to the jury hearing those references, and that the trial court disregarded his objection and received the interview without regard to his objection that there were references to drug usage. Such is not an accurate representation of what transpired at trial. Rather, the record is clear that the court and the State agreed that references to drug usage should not be published to the jury and the State represented that those references were redacted from the exhibit so that the jury would not hear them. The court even took a break during which the State reviewed the exhibit again to make sure this was done. Gomez did not further object. On appeal, he has not provided any indication that any references to drug usage remained in the exhibit that was published to the jury. Gomez' argument that the court erred in admitting this exhibit over his objection is meritless.

(b) Testimony About Facebook Messages

On appeal, Gomez next argues that the court erred in its rulings concerning testimony of Deputy Carey concerning N.G.'s Facebook account. Specifically, he complains that after the court sustained one objection to a question asked by the State, it overruled an objection to a second question. This argument has no merit.

During his testimony, Deputy Carey was asked about a series of Facebook messages that appeared on N.G.'s Facebook account and appeared to be a private conversation between Gomez and N.G. During that testimony, the State asked Deputy Carey if he had read the messages, and he indicated that he had. The State then asked, "Did you come away with any impressions or anything unusual, anything extracted as unusual?" Gomez' counsel objected "to the form of the question," and the court sustained the objection. The State then asked, "What was your impression of the Facebook messages?" Gomez' counsel made the "[s]ame objection," which was overruled. Deputy Carey answered that "[t]here was one part in there that [he] felt was rather disturbing." He was not then asked what part or what he found disturbing. Gomez' counsel asked questions about the topic during his cross-examination of Deputy Carey.

In his brief, Gomez "[grants that] the objection was to the form of the question and it should have been also objected to on grounds of relevance," but argues that "how that question

could be objectionable [as first asked] and then alright when the question was [as asked the second time] is difficult to discern." Brief for appellant at 25.

On appeal, a defendant may not assert a different ground for his objection to the admission of evidence than was offered at trial. See *State v. Timmens*, 263 Neb. 622, 641 N.W.2d 383 (2002). An objection, based on a specific ground and properly overruled, does not preserve a question for appellate review on any other ground. *Id.*

The first time that the question was asked, it was properly objectionable as to form and the court properly sustained Gomez' objection on that basis. The State rephrased the question, and the second time it was asked there was no longer a problem with its form. Gomez' objection to the question the second time it was asked was only to its form, and Gomez did not object on the basis of relevance. Gomez cannot, on appeal, assert a different basis for objecting to the question that was not raised to the trial court. This argument is meritless.

### (c) Alleged Hearsay

On appeal, Gomez next argues that the court erred in allowing one of N.G.'s friends to testify about a statement N.G. had made to the witness. Gomez argues that the statement was hearsay and that it was not properly received for its effect on the hearer or to rebut allegations of recent fabrication.

One of N.G.'s friends testified that she had gone to the fair with N.G. and one other friend. The State asked her, "When you were at the fair . . . did [N.G.] ever tell you anything that was disturbing to you?" The friend answered, "Yes." The State then asked her what N.G. had said, and Gomez' counsel objected on the basis of hearsay. In response, the State indicated that the testimony was being elicited "for the effect on the [hearer], and also to rebut any recent allegations of recent fabrication." The court overruled the objection. The friend then testified that N.G. had told her that "she was afraid of what her dad might do if she was late or didn't do . . . a chore or something. And she was afraid that he might hurt her."

Gomez' counsel again objected and asked the court to strike the answer. In a sidebar, Gomez' counsel argued that the testimony could not be elicited to rebut an allegation of fabrication because N.G. had not yet testified and that it was, therefore, "premature." The State argued that Gomez' counsel had "brought it up in his opening statement" and again argued that the testimony "goes to the effect on the [hearer] as directly relevant to the facts in this case." The court emphasized that Gomez' counsel had brought the matter of fabrication up in his opening statement and indicated concern that the parties would be "parading witnesses back and forth" when "the issue is whether or not [N.G.] is telling the truth." The court again overruled the objection.

The State then asked the friend what N.G. had told her that she considered troubling. Gomez again objected "on hearsay," and the court again overruled the objection. The friend testified, again, that N.G. had said that she was afraid of what Gomez might do if she came home late or did not do her chores and that she was afraid Gomez might hurt her.

In his brief on appeal, Gomez argues only that the testimony was not properly elicited to rebut an allegation of fabrication because N.G. had not yet testified or had a statement presented to the jury for which any allegation of fabrication could have been made or needed to be

- 11 -

rebutted. Gomez has not presented any argument about why this testimony was not properly elicited for its effect on the hearer.

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. *State v. Reinhart*, 283 Neb. 710, 811 N.W.2d 258 (2012). An extrajudicial statement not offered to prove the truth of the matter asserted is not hearsay. *State v. Foster*, 286 Neb. 826, 839 N.W.2d 783 (2013).

In this case, the statement was relevant for a nonhearsay purpose to demonstrate its effect on the hearer. N.G.'s friend testified that because she was concerned by N.G.'s statement she "made the decision to tell a responsible adult." She testified that she told her grandmother. The friend's grandmother subsequently testified that when her granddaughter told her, she talked to a coworker about it and that the coworker made a "report to the state." Gomez did not object to the grandmother's testifying about what she did when she heard the statement or about her coworker making a report. Deputy Carey testified that the investigation in this case was prompted by two reports about N.G.'s making statements concerning Gomez, one from the school and one from the person identified as the coworker of N.G.'s friend's grandmother.

Because the testimony was relevant to the issues concerning the initiation of the investigation in this case, it was appropriately offered for its effect on N.G.'s friend and to demonstrate the chain of events that led to the investigation. The statement was not offered to prove the truth of the matters asserted by N.G. It was nonhearsay, and Gomez' argument to the contrary is without merit. We need not further consider whether the statement was appropriate to rebut any allegation of fabrication.

(d) N.G.'s Impression of Facebook Message

On appeal, Gomez next argues that the court erred in allowing N.G. to testify about what a particular statement made in a Facebook message from Gomez to her meant to her, after twice sustaining objections to questions asking N.G. what the statement meant. This argument is also without merit.

During her testimony, N.G. was asked questions about a particular statement that appeared in a Facebook message that appeared to have been sent from Gomez to N.G. The message stated, "If you're not red, we'll get the punishment out of the way."

The State first asked N.G. to "[t]ell the jury what that means." Gomez' counsel objected that the question "calls for an interpretation by the witness, and the witness is not the one claiming to be the declarant of the statement. Lacks foundation." The court sustained the objection.

The State then asked a handful of additional questions about how one could tell that Facebook messages were being sent from a particular person or to a particular person. The State then asked, "Did you receive [the above quoted] message that's dated August 27?" N.G. answered, "Yes." The State then asked, "When you received it, did you know what that meant where it says: 'If you're not red?'" N.G. again answered, "Yes." The State then asked N.G. to "tell the jury what that means." Gomez' counsel again objected that the statement was "not by this person as declarant and it calls for speculation and interpretation as to what the statement meant." The court again sustained the objection.

The State then asked N.G., "Did you have an understanding yourself of what it means to say, 'If you're not red?'" N.G. responded, "Yes." The State then asked N.G. to "[t]ell the jury what it means to you." Gomez' counsel made the "same objection." This time, the court overruled the objection and allowed N.G. to testify that the statement meant "if [she was] off [her] period."

In his brief on appeal, Gomez argues that "[h]ow this question could be improper twice but the third time be proper is hard to understand" and argues that "[s]imply couching it in terms of what it means to [N.G.] as opposed to what it means, is a distinction without a difference." Brief for appellant at 27. We disagree.

The first two times the question was asked, the question specifically requested an answer that had not been shown to appropriately be within N.G.'s knowledge--it asked for information about what Gomez meant, without any foundation to demonstrate that N.G. knew what was in Gomez' mind when he wrote the words. As a result, the court appropriately sustained objections related to the lack of foundation and the speculation about Gomez' intent.

The third time, however, the question was no longer phrased to ask what Gomez meant or what was in his mind. The third time the question was asked, it was rephrased to be specifically limited to N.G.'s understanding of the message. As such, there was no longer any problem related to foundation or speculation, which were the only two grounds upon which Gomez' counsel had raised an objection. The rephrasing of the question is not a distinction without a difference. The rephrasing resulted in a completely different question being asked and resulted in the inapplicability of the objections Gomez raised.

In his brief on appeal, Gomez adds that "[a]nd what it means to her is irrelevant at any rate." Brief for appellant at 27. We need not address whether N.G.'s understanding of the phrase was relevant because Gomez did not raise any objection to the question or the testimony on the basis of relevance. On appeal, a defendant may not assert a different ground for his objection to the admission of evidence than was offered at trial. See *State v. Timmens*, 263 Neb. 622, 641 N.W.2d 383 (2002). An objection, based on a specific ground and properly overruled, does not preserve a question for appellate review on any other ground. *Id*. This argument is meritless.

(e) Report to DHHS

On appeal, Gomez next argues that the court erred in allowing testimony of a counselor from N.G.'s school about what she had stated in a report to DHHS. Gomez argues that the testimony lacked foundation and was "double hearsay." Brief for appellant at 27-28. We find no merit to this assertion.

The counselor testified that she made a report to DHHS concerning N.G. On cross-examination, the State asked the counselor, "[O]ther than what [she] reported about what [N.G.] told [her] what else did [she] report" to DHHS. Gomez' counsel objected on the basis of foundation and the question calling for "double hearsay." The court overruled the objection, indicating that it did not "think it's being offered for the truth of the matter asserted, only as to why she might have made a report."

The counselor then testified that the school had received notification from a parent that N.G. had reported that Gomez drank a lot and used drugs and that Gomez "had asked to have sex with [N.G.], and if . . . she would not have sex with him, that he wanted her to go between his

legs." Gomez' counsel renewed his objection and asked that the answer be stricken. The court overruled the objection, but instructed the jury that the testimony was not admissible for the truth of what was asserted and was limited only to consideration of the reason that the counselor had made a report to DHHS.

On appeal, Gomez argues that the reason for the counselor's making a report to DHHS "was irrelevant and even if it did have some minor relevance that relevance was outweighed by the undue prejudice of having the jury hear accusations that [Gomez] drank and used drugs as made by some anonymous [person] who could not be cross-examined." Brief for appellant at 28. Once again, however, Gomez did not object to this testimony on the basis of relevance or on the basis of undue prejudice, and we do not consider whether those objections would have been properly sustained. See *State v. Timmens, supra*. The testimony was relevant to establishing why the counselor made a report, and the report was relevant to the start of the investigation in this case. The testimony was not offered for the truth of the matters asserted therein, and the jury was specifically instructed not to consider it for that purpose. This argument is also without merit.

### (f) Conclusion

We have concluded that none of the specific arguments raised in Gomez' brief concerning alleged errors by the district court in ruling on objections has merit. As noted above, Gomez did not present any argument to demonstrate why there was any cumulative effect from these alleged errors, and, inasmuch as we do not find merit to any of the assertions on their own, we likewise find no merit to the assertion of cumulative error. This assigned error is without merit.

### 3. STATE'S EXPERT

Gomez next asserts that "[t]he court erred in allowing an expert to testify who had never seen the victim or any reports." There is no separate argument section in Gomez' brief devoted to this assignment of error, and it is not clear on appeal whether Gomez is asserting error with regard to the expert witness called during the State's case in chief or the rebuttal witness called by the State after Gomez had rested his case.

It is firmly established that to be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *State v. Fioramonti*, 22 Neb. App. 52, 847 N.W.2d 95 (2014).

In this case, it is arguable that Gomez has waived the right to have this assignment of error considered. There does not appear to be a specific argument concerning the testimony of the expert called during the State's case in chief, which is the witness that the assignment of error seems to be directed toward. There is an argument presented, in the midst of Gomez' arguments about cumulative evidentiary rulings discussed above, concerning specific testimony allowed from the State's rebuttal witness. In the interest of completeness, we briefly address both witnesses' testimony.

During its case, the State called a clinical psychologist to testify "generally" about psychology as it relates to child sexual abuse. The State specifically represented at the outset of the psychologist's testimony that it was "not going to ask [him] anything about this case." Gomez objected to the psychologist's testimony on the grounds that "the topic is irrelevant and

it's speculative unless there's a foundation provided that [the psychologist] has actually interviewed the child in this case." The court overruled the objection, but granted Gomez a continuing objection to the psychologist's testimony.

The psychologist presented testimony about "how children tell about being sexually abused," how they respond to being interviewed, the frequency of "delayed disclosure," and various reasons explaining why children do not always "tell about abuse right away." He testified about ways in which children can "sometimes get used to being sexually abused" and ways in which they "may try to adjust to it or tolerate it." He also testified about the possibility of children falsely reporting sexual abuse.

The psychologist was cross-examined by Gomez' counsel. He acknowledged that he had never met N.G. and had not reviewed any psychological or mental health examination records or medical records regarding her. He also acknowledged that he had never met Gomez and had not evaluated or reviewed any mental health or medical records regarding him. He acknowledged that he was not providing any specific opinions regarding this case.

The State's rebuttal witness provided testimony in rebuttal to Gomez' expert's testimony. During her testimony, the State asked her the following question:

> How does the home environment of a child affect psychological - let's see. Discuss a child's background as it relates to examination or - sorry, I'm tired. Could you discuss the importance of a child's background as relates to child abuse?

Gomez' counsel objected that "[t]he witness hasn't expressed she's formulated an opinion on the topic, and I think the form of the question is inappropriate, too." The State reformulated the question as, "What impact does the child's home environment have on sexual abuse?" Gomez' counsel made the "same objection." The court overruled the objection, and the rebuttal witness testified that there are generally no specific backgrounds or behaviors that necessarily indicate whether a child has or has not been sexually abused.

In addition, the rebuttal witness was asked to provide general testimony about confirmatory bias. Gomez objected on the basis of relevancy. The court overruled the objection, and the rebuttal witness testified generally that the purpose of interviews at places like the Child Advocacy Center is to provide the most comfortable environment in which to get the statement from the child and that the risk of influences on the child is "much less" of a concern as children get older than when children are younger.

In his brief on appeal, Gomez argues that the rebuttal witness was not asked if she had been able to formulate opinions about the specific facts of this case, the impact N.G.'s home environment might have had on her allegations, or about confirmatory bias in the present case. Gomez argues that "[t]his witness had never seen the child, talked to the child, or seen any reports regarding this child." Brief for appellant at 29.

Our review of the record indicates that neither witness was asked by the State about the specifics of this case. The first witness was called to present general testimony about sexual abuse cases, specifically testified that he was not rendering any opinions about the details of the present case, and was thoroughly cross-examined by Gomez' counsel. Similarly, the rebuttal witness presented general testimony after Gomez' expert had called into question the reliability of interviews of N.G. The rebuttal witness testified generally about child abuse cases, proper

interview procedures, and the potential risk of confirmatory bias. Her testimony was all presented as rebuttal to the suggestions of Gomez' expert witness. To the extent Gomez has not waived consideration of any alleged error concerning these witnesses' testimony, we find the assertion of error to be without merit.

## 4. SEQUESTRATION ORDER

Gomez next asserts that "[t]he court erred in lifting the sequestration order in the middle of the trial so that the State's undisclosed rebuttal expert could listen to [Gomez'] expert." Gomez argues that it was "[p]erhaps the most egregious, damaging error by the court" to allow the State's rebuttal expert to be present in the courtroom and to listen to Gomez' expert witness' testimony "after the State had called one expert to testify that [Gomez'] expert was not allowed to sit in on." Brief for appellant at 29. We find no merit to this assertion.

The trial court has broad discretion over the general conduct of trial. *State v. Archie*, 273 Neb. 612, 733 N.W.2d 513 (2007). The court must also exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence, so as to make the interrogation and presentation effective for the ascertainment of the truth. *Id.*

To establish reversible error due to violation of a sequestration order, a defendant must make a showing of prejudice. *State v. Cottingham*, 226 Neb. 270, 410 N.W.2d 498 (1987); *State v. Hess*, 225 Neb. 91, 402 N.W.2d 866 (1987).

The record suggests that several months prior to trial, Gomez moved for sequestration of witnesses during the trial and the district court granted the motion. During Gomez' case, the State requested "the sequestration order be lifted for the purposes of one witness, [a] rebuttal expert, so that she may observe [Gomez'] expert" witness' testimony. Gomez objected to the State's request.

Gomez' counsel noted that during a pretrial hearing for the appointment of an expert, the court had specifically cautioned Gomez' counsel to "employ . . . restraint" and had noted that the court did not "want this to get out of hand in terms of the economic expenses of it." The court had indicated that it did not "expect this [expert retained on Gomez' behalf] to sit in here for a one or two week jury trial and listen to everything that's happened, and charge the county $150 an hour or whatever they charge." Gomez' counsel argued that based on the sequestration order and the court's indications that Gomez' retained expert was not to be in the courtroom and listening to testimony, he had instructed the retained expert "specifically that she would not be permitted to be in the courtroom during the testimony of other witnesses."

Gomez' counsel argued that Gomez' retained expert would have been available to listen to the expert called on behalf of the State, but that he "adhered to the . . . sequestration order." He argued that the State's motion to lift the sequestration order for its rebuttal witness was untimely and would unfairly prejudice Gomez' defense.

The court noted that it had "allowed this type of situation to occur before" and noted that expert witnesses are not factual witnesses. The court concluded that it did "not believe that . . . Gomez would be prejudiced by this" and overruled his objection. Additionally, the court later granted Gomez' motion to further modify the sequestration order to allow his expert witness to be present during the testimony of the State's rebuttal witness.

There is no indication in the record presented to us that Gomez made any request to have his expert witness be allowed to listen to the testimony of the State's expert witness. Although his argument on appeal is largely devoted to suggesting that it was prejudicial to grant the State's request to allow the rebuttal witness to listen to the testimony of Gomez' expert but not to allow his own expert to listen to the testimony of the State's initial expert, there is no indication that he requested such or that the court refused to allow him a similar exception to the sequestration order. The court's comments during the appointment of Gomez' expert do not demonstrate that the court would not have allowed Gomez' expert to listen to the testimony of one particular witness; rather, the court's comments indicated that Gomez' expert should not sit in during the entirety of the lengthy trial.

Not only does the record fail to demonstrate that Gomez requested any modification to the sequestration for his expert witness to listen to the testimony of the State's initial expert, but it affirmatively demonstrates that the court did allow a similar modification of the sequestration order to allow Gomez' expert to listen to the testimony of the State's rebuttal expert. Gomez has not demonstrated any actual prejudice from the court's discretionary handling of the sequestration order in this case. See *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006) (defendant must prove that alleged error actually prejudiced rather than creating only possibility of prejudice). This assigned error is without merit.

### 5. UNDISCLOSED EXPERT

Gomez next asserts that "[t]he court erred in allowing an undisclosed expert to testify." He argues that it was error to allow the State to call a rebuttal witness who had not been disclosed prior to the start of trial. This assertion is meritless.

After the district court overruled Gomez' objection to the State's motion to lift the sequestration order for its rebuttal witness to observe the testimony of Gomez' expert witness, Gomez objected to the witness' being allowed to testify because she had not been previously disclosed as a possible witness in the case. On the basis that she was a rebuttal witness, the court overruled Gomez' objection.

Gomez' expert provided testimony about her opinions about the investigation and analysis of the reports in this case. She expressed concerns that there was not exploration of DNA evidence to bolster or corroborate N.G.'s assertions, that there had not been an explanation for any "alternative hypothesis" as a cause of N.G.'s behavior, and that there was potentially "confirmatory bias" throughout the work done by "the investigators, the therapists, the police department." She expressed concern that therapists who had spoken with and worked with N.G. had not conducted a sufficient differential diagnosis.

Gomez' expert also testified about what she believed was necessary to constitute proper training and protocols for conducting interviews with children who report sexual abuse. She testified that she had "many issues" with the interviews of N.G. that were conducted in this case, including that N.G. only reported "real serious issues as time went on" and that "there was nobody in [N.G.'s] life . . . that ever questioned [her] reliability or history, her memory." She also emphasized that N.G. had "in no way appeared to be traumatized" at the time of her first interview with the Child Advocacy Center and that she "seemed a little bit immature, tomboyish."

The State's rebuttal witness addressed a number of the topics testified to by Gomez' expert. She testified that psychologists are not trained in how law enforcement investigations should be conducted. She testified that a differential diagnosis is not appropriate with respect to whether someone has been sexually abused, although certain symptoms might be appropriately subject to a differential diagnosis. With respect to N.G.'s demeanor during her interviews at the Child Advocacy Center, she testified that one of the primary purposes of an advocacy center is to make the child feel as comfortable and relaxed as possible.

Gomez' counsel conducted a cross-examination of the State's rebuttal witness. During the cross-examination, he asked the witness questions about appropriate interviewing of children who report sexual abuse and about the potential effects of caseworkers having contact with a reporting child outside of the confines of an advocacy center. He also questioned her about her opinions concerning differential diagnoses in sexual abuse cases.

It has long been the rule in this state that the requirement that the names of the witnesses for the state must be endorsed upon the information has no application to rebuttal witnesses. *State v. Canbaz*, 259 Neb. 583, 611 N.W.2d 395 (2000); *State v. Pratt*, 197 Neb. 382, 249 N.W.2d 495 (1977). It is clear that the witness was properly considered a rebuttal witness, presented testimony directly in rebuttal to Gomez' expert witness' testimony, and was properly allowed to testify. This assigned error is meritless.

We note that in his brief on appeal, Gomez also presents an argument that the district court erred in refusing to grant his motion for a mistrial "based on the sequestration order change." Brief for appellant at 36. Gomez did not assign as error any allegation related to a motion for mistrial and has, accordingly, not properly presented such an assertion on appeal. See *State v. Fioramonti*, 22 Neb. App. 52, 847 N.W.2d 95 (2014) (must both specifically assign and specifically argue alleged error). In addition, to the extent we have concluded that there was no error related to the court's discretionary handling of the sequestration order, it is clear that a mistrial was not warranted on that basis.

### 6. § 28-319.01

Gomez next asserts that "[t]he court erred in applying . . . § 28-319.01 sentencing standards when the Information led [Gomez] to believe that it was a 15 year non-mandatory minimum sentence for [the first degree sexual assault of a child charge]." Gomez was properly advised about the potential sentencing range in this case, including the mandatory minimum 15-year sentence required upon conviction, and this assertion of error is without merit.

At the conclusion of the case, at a hearing on a motion for new trial that is discussed more thoroughly below, Gomez asserted that he had been subject to "accident or surprise" regarding the potential sentencing range on the first degree sexual assault of a child conviction. He argued that he discovered through the presentence investigation report that a Class IB felony charge "has a maximum sentence of life imprisonment and minimum sentence of 20 years in prison." Gomez "indicated surprise at that and pointed out . . . that the Information filed by the State had indicated . . . that [the first degree sexual assault of a child charge] carried a minimum sentence of 15 years imprisonment." He noted that this recitation was present in the original information and again in each of the five amended informations. He asserted that "he was misinformed, feels he was misled in that regard, and that the representation . . . did affect his

decision-making as far as determining whether . . . to enter plea negotiations, . . . to accept plea offers . . . and whether . . . to proceed with trial in this case."

The State noted that § 28-319.01 "itself says there's a mandatory 15 year minimum sentence." The State noted that although the penalty for a Class IB felony is 20 years' to life imprisonment, the sexual assault penalty section provides that the particular first degree sexual assault charged in this case is subject to a mandatory minimum sentence of 15 years that has to be served "before he's parole eligible." The State submitted that the various informations contained "a correct statement of the law." The State also argued that the court had appropriately "explained the punishment portion at arraignment and at the pretrial hearing."

The record reflects that every information filed, from the original information through each of the amended informations and including the fifth amended information, which trial was held on, indicated that the first degree sexual assault of a child charge was being brought pursuant to § 28-319.01(1)(b) and that the relevant penalty section was § 28-319.01(2). Each information indicated that the charge was a Class IB felony offense and that there was a "15 year minimum sentence." At the time of Gomez' arraignment, the district court specifically explained to him that the charge was a Class IB felony offense that had "a minimum imprisonment sentence of 20 years and a maximum of life" and explained that "[h]owever, if . . . found to have committed this offense, [Gomez] would be subject to a mandatory minimum of 15 years, and that would mean that [he] would not be eligible for parole or probation until that 15 year period has elapsed."

Gomez' argument on his motion for new trial and on appeal that he was surprised to discover, after trial, that the first degree sexual assault of a child conviction carried a minimum sentence of 20 years' imprisonment and that the 15-year "minimum" term of imprisonment referenced in the various informations filed in this case was a mandatory minimum is belied by the record, which demonstrates that he was specifically advised of both. The court did not commit error in applying § 28-319.01(2), which section was specifically referenced in the operative information and specifically and clearly indicates there is a 15-year mandatory minimum that was explained to Gomez at his arraignment. This assignment of error is meritless.

7. SUFFICIENCY OF EVIDENCE

Gomez next asserts that "[t]here was insufficient evidence with which to convict [him]." Gomez argues on appeal that "the fact of the matter is here [sic] that the purported victim was, in essence, the only evidence of [Gomez'] guilt" and then argues at length about why her testimony should not be found to be credible. We do not reassess credibility of witnesses on appeal, Gomez does not assert that the State failed to present testimony establishing the elements of the crimes of which he was convicted, and this assignment of error is without merit.

In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Wiedeman*, 286 Neb. 193, 835 N.W.2d 698 (2013). On a challenge to the sufficiency of the evidence, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *id.*

Gomez' argument on appeal consists primarily of several pages of argument about why N.G.'s testimony lacked credibility and contained inconsistencies. Gomez had the opportunity to argue those credibility issues and inconsistencies to the jury and, in fact, did cross-examine witnesses and spent considerable time at trial demonstrating the very issues he now argues on appeal. Despite his acknowledgment on appeal that credibility matters are not reconsidered on appeal and are for the finder of fact, the sum and substance of his argument concerning the alleged insufficiency of the evidence is that it was insufficient because of credibility matters.

The testimony of N.G. and the other key witnesses has been recounted in some detail above and need not be restated here. We do not reassess the credibility of witnesses that the jury chose to believe, and after viewing the testimony in the light most favorable to the State, it is clear that a rational trier of fact could have found the essential elements of the crimes proven beyond a reasonable doubt. This assignment of error is without merit.

### 8. MOTION FOR NEW TRIAL

Finally, Gomez asserts that the "court erred in overruling [his] Motion for New Trial." The motion was based on the same assertions of error already discussed thoroughly above, and like those assertions of error, the assertion that the court erred in denying a new trial lacks merit.

In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Ramirez*, 287 Neb. 356, 842 N.W.2d 694 (2014).

Gomez filed a motion for new trial. In the motion, he alleged that a new trial was warranted on the basis of irregularity in the proceedings; misconduct of the jury, prosecuting attorney, or witnesses for the State; accident or surprise; insufficiency of the evidence; and error of law. At the hearing on his motion, Gomez' counsel offered an affidavit of Gomez.

At the hearing on his motion, Gomez' counsel "reassert[ed] the objections that were made during the trial, evidentiary rulings" made by the court, and specifically pointed to the court's "lifting the motion to sequester regarding the State's expert witness" and the insufficiency of the evidence as supporting the motion for new trial. He also raised the issue addressed above concerning the potential range of sentences under § 28-319.01 and argued that "accident or surprise" with respect to the range of sentences justified a new trial.

Inasmuch as we have already found that Gomez' various assertions of error lack merit, and inasmuch as his motion for new trial was premised on the same assertions of error already discussed more thoroughly above, we likewise find no abuse of discretion by the district court in denying his motion for new trial. This assignment of error is without merit.

### V. CONCLUSION

We find no merit to Gomez' assertions on appeal. We affirm.

AFFIRMED.